**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. 22-10877 (LSS) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| MARINER HEALTH CENTRAL, INC., PARKVIEW HOLDING COMPANY GP, LLC, AND PARKVIEW OPERATING COMPANY, LP, | Adv. Proc. No. 22-50418 (LSS) |
| Plaintiffs. | |
| v. | |
| FILIMON ARZETA, JESSE GARRETT, JANET HORROBIN, JAMES MARTIN, TERESA MEADORS, CHRISTINE VASSIS, ALMA BUNCH, KYU CHUNG, SUSAN MYUNG WON, SOON CHOI HYO, YOUNG JUNG HYO, BRIAN BYUNG HWA CHUNG, MARIA CONTRERAS, SCOTT COOK, ALYSSA DOE, JEFF DOE, ANA MARIA FLORES, PAULA GREENE, DANA GREENE-COWARD, CARLENE HUFFMAN, KATHY HUNTER, TRACY JACKSON, AVIS DEWALT, DAVONTE BARFIELD, MARGO L., MELVIN LOFTON, AZHYA JONES, YVONNE LOFTON, SYLVIA LOFTON, PHILIP MANGANO, IRMA SUAREZ, SOPHIA SUAREZ, CHRISTOPHER PAUL TUCKER, JASON TUCKER, CASEY TUCKER, STEPHEN TUCKER, AND TEOLA WATSON, | **Hearing Date: October 25, 2022 at 11:00 a.m. (ET)**<br>**Obj. Deadline: October 18, 2022 at 4:00 p.m. (ET)** |
| Defendants. | |

**MOTION OF THE DEBTORS FOR AN ORDER EXTENDING THE AUTOMATIC STAY, OR IN THE ALTERNATIVE GRANTING INJUNCTIVE RELIEF, TO STAY PROSECUTION OF CERTAIN ACTIONS AGAINST NON-DEBTOR AFFILIATES**

---

[1]   The Debtors, along with the last four digits of each Debtors' tax identification number, are Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................. 2

FACTUAL BACKGROUND .................................................................................................... 2

   A.   The Chapter 11 Cases ................................................................................................ 2

   B.   The Covered Actions ................................................................................................ 4

   C.   The Debtors' Indemnification Obligations ......................................................... 6

   D.   The Discovery and Litigation Burdens on the Debtors ................................... 7

   E.   The Debtors' Reorganization Efforts .................................................................... 8

RELIEF REQUESTED ............................................................................................................ 9

BASIS FOR RELIEF REQUESTED ..................................................................................... 9

   A.   The Automatic Stay Should Be Extended ...................................................... 10

       i.     Allowing the Covered Actions to Continue will Heavily Prejudice the Debtors . 12

       ii.    Allowing the Covered Actions to Continue Will Heavily Burden the Debtors.... 14

       iii.   Mariner Central is Obligated to Indemnify the Operators ................................... 15

   B.   In the Alternative, the Continuation of the Covered Actions Should be Enjoined ........... 16

       i.     There is a Reasonable Likelihood that the Debtors Will Successfully Restructure ................................................................................................ 17

       ii.    Continuation of the Covered Actions Will Irreparably Harm The Debtors.......... 18

       iii.   The Balance of Harms Favors the Debtors ........................................................ 21

       iv.   An Injunction Serves the Public Interest ............................................................ 22

RESERVATION OF RIGHTS ............................................................................................. 23

NOTICE ................................................................................................................................... 24

CONCLUSION ........................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.H. Robins Co. v. Piccinin,*
  788 F.2d 994 (4th Cir. 1986) ................................................................................ 11, 13

*Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.),*
  111 B.R. 423 (Bankr. S.D.N.Y. 1990) ................................................................... 11, 13

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,*
  No. 06-5358 (PKC), 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) .............. 20

*In re 1031 Tax Grp., LLC,*
  397 B.R. 670 (Bankr. S.D.N.Y. 2008) ................................................................... 21

*In re Adelphia Commc'ns,*
  302 B.R. 439 (Bankr. S.D.N.Y. 2003) ................................................................... 19

*In re Am. Film Techs., Inc.,*
  175 B.R. 847 (Bankr. D. Del. 1994) ...................................................................... 11, 19, 22

*In re Caesars Ent. Operating Co.,*
  808 F.3d 1186 (7th Cir. 2015) ............................................................................... 22

*In re Calpine Corp.,*
  354 B.R. 45 (Bankr. S.D.N.Y. 2006) ..................................................................... 11, 19, 21

*In re Cont'l Airlines,*
  177 B.R. 475 (D. Del. 1993) .................................................................................. 20

*In re Eagle-Picher Indus., Inc.,*
  963 F.2d 855 (6th Cir. 1992) ................................................................................. 11, 17

*In re Ionosphere Clubs, Inc.,*
  124 B.R. 635 (S.D.N.Y. 1991) ............................................................................... 16

*In re Lyondell Chem. Co.,*
  402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................................... 17

*In re Midway Games, Inc.,*
  428 B.R. 327 (Bankr. D. Del. 2010) ...................................................................... 10, 11

*In re Sudbury, Inc.,*
  140 B.R. 461 (Bankr. N.D. Oh. 1992) ................................................................... 12, 17

*In re Union Trust Phila., LLC,*
  465 B.R. 765 (Bankr. E.D. Pa. 2011), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011) .......... 17

*In re Univ. Med. Ctr.,*
  973 F.2d 1065 (3d Cir. 1992) ................................................................................ 10

*In re W.R. Grace & Co.,*
  412 B.R. 657 (D. Del. 2009) .................................................................................. 17

*Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.),*
  117 B.R. 64 (S.D.N.Y. 1990) ................................................................................. 19, 20

*Majestic Star Casino v. City of Gary (In re Majestic Star Casino, LLC),*
  No. 10-50841(KG), 2010 WL 2540457 at *2 (Bankr. D. Del. Apr. 24, 2010) ........ 11

*McCartney v. Integra Nat. Bank N.,*
  106 F.3d 506 (3d Cir. 1997) .................................................................................. 10, 16

*Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
   365 B.R. 401, 413 (S.D.N.Y. 2007) ................................................................ 20, 22

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003) .......................................................................... 10, 11

**Statutes**

11 U.S.C. § 105(a) ........................................................................................... 16

11 U.S.C. § 105(a)(1) ...................................................................................... 10

11 U.S.C. § 362(a)(1) ........................................................................................ 9

11 U.S.C. § 362(a)(3) ........................................................................................ 9

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977) ...................................... 10

Plaintiffs, as debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and as plaintiffs in this adversary proceeding, hereby move (this "**Motion**") for the entry of an order extending the automatic stay pursuant to sections 105 and 362 of the Bankruptcy Code to stay or enjoin the continuation of the Covered Actions against the Non-Debtor Affiliates (as such terms are defined below).  In support of this Motion, the Debtors rely upon their complaint, the *Declaration of Kristy Owen in Support of Motion of the Debtors for an Order Extending the Automatic Stay, or in the Alternative Granting Injunctive Relief, to Stay Prosecution of Certain Actions Against Non-Debtor Affiliates* (the "**Owen Declaration**"), filed contemporaneously herewith, and the *Declaration of Lawrence R. Perkins in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Perkins Declaration**"), filed on the main docket for these Chapter 11 Cases, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors request declaratory or injunctive relief to prevent the Defendants, as plaintiffs in the pending lawsuits or arbitration proceedings identified on **Exhibit 1** hereto (the "**Covered Actions**"), from continuing to prosecute the Covered Actions.

2.      The Bankruptcy Code operates to automatically stay the Covered Actions with respect to the Debtors.  However, the Covered Actions also assert claims against other defendants, all of which are individuals or entities that are affiliates of the Debtors (the "**Non-Debtor Affiliates**").  The Court should further stay or enjoin the continuation of the Covered Actions against the Non-Debtor Affiliates pursuant to sections 105(a) and 362(a) of the Bankruptcy Code.

3.      If the Covered Actions are allowed to continue against the Non-Debtor Affiliates: (a) the Debtors face significant estoppel, preclusion and/or evidentiary prejudice, (b) the Debtors face heavy discovery and litigation burdens that will significantly interfere with their restructuring

1

efforts, (c) the Debtors face significant indemnification and advancement claims from the Non-Debtor Affiliates, and (d) insurance policies and proceeds that are property of the Debtors' estates will be depleted.  Accordingly, the Court should extend the automatic stay to stay, or enjoin the continuation of, the Covered Actions against the Non-Debtor Affiliates.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     The bases for the relief requested herein are sections 105(a), 362(a)(1), and 362(a)(3) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.     The Debtors confirm their consent to the entry of a final order by the Court in connection with this adversary proceeding if later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

A.     **The Chapter 11 Cases**

7.     On September 19, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  The Debtors are operating as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases, and no official committees have been appointed or designated.

8.      The three Debtors are part of the Mariner Health Care group of healthcare services providers, consultants and holding companies, all of which are direct or indirect subsidiaries of non-Debtor Mariner Health Care, Inc. (collectively, the "**Mariner Companies**").  Certain of the Mariner Companies operate 20 skilled nursing facilities (the "**Mariner Facilities**"), with nearly 2,200 licensed beds and approximately 3,100 employees, that provide short-term rehabilitation, comprehensive post-acute skilled care, long-term care, therapy, and other services.  Perkins Decl. ¶ 9.  For more than 30 years, the Mariner Facilities have delivered quality, affordable care to historically underserved persons and communities.  *Id.*  Additional information regarding the Debtors' operations, structure, liabilities, and the events leading up to the commencement of these cases is set forth in the Perkins Declaration, which is incorporated herein by reference.

9.      Debtor Parkview Operating Company, LP ("**Parkview**") operates a skilled nursing facility with 121 beds located in Hayward, California (the "**Parkview Facility**"), while Debtor Mariner Health Central, Inc. ("**Mariner Central**") provides administrative, clinical and operational support services to Parkview and to the other Mariner Companies that operate the Mariner Facilities (collectively with Parkview, the "**Operators**").  Perkins Decl. ¶ 11.  Debtor Parkview Holding Company GP, LLC is the general partner of Parkview.  *Id.*

10.      Each Operator is party to an Administrative, Clinical and Operational Support Agreement (each, a "**Support Agreement**") with Mariner Central, an example of which is attached as Exhibit A to the Owen Declaration.  Under the Support Agreements, Mariner Central provides each counterparty Operator with various services such as: (a) administration of payroll and personnel services; (b) bookkeeping, accounting and related administrative support, budgeting,

financial analysis and reporting; (c) billing and collection services; (d) orderly and timely payments of all accounts payable related to the operations of the applicable Facility, including taxes, insurance premiums, and vendor payables; (e) assistance in securing insurance; (f) handling Medicaid, Medi-Cal, and other reimbursement programs; (g) preparation and filing of tax returns; (h) negotiating and managing national contracts and other purchasing services; and (i) insurance procurement.  Perkins Decl. ¶ 14.

11.    Mariner Central also (i) bills and submits claims to Medicare, and is responsible for reporting and returning overpayments, on behalf of the Operators; (ii) coordinates offsite document storage; (iii) assists Operators with clinical support, including providing policies and procedures and training thereon, and provides a wide range of supporting activities through operational support teams; and (iv) provides in-house counsel, legal support and compliance services to the Operators and obtains, directs and coordinates with outside counsel as needed.  Owen Decl. ¶¶ 7,8.

## B.    The Covered Actions

12.    The Covered Actions are pending lawsuits or arbitration proceedings, identified on Exhibit 1,[1] brought against Mariner Central (and Parkview, in two instances) and various Non-Debtor Affiliates, (i) by or on behalf of current or former residents of Mariner Facilities asserting various damages, personal injury or wrongful death claims under statutory or tort theories of liability relating to alleged inadequate care, negligence, or other misconduct; or (ii) by current or former employees alleging wrongful termination and/or various wage violations or discrimination claims under applicable laws.  For the avoidance of doubt, the Debtors and their co-defendants dispute the allegations in and are defending against each of the Covered Actions.

---

[1] Since filing the complaint initiating this adversary proceeding, Mariner Central has been dismissed from that action identified therein with case no. C22-01182.  The Debtors are not seeking the relief requested herein with respect to such action, and reserve all rights with respect thereto.  *See infra* ¶¶ 58, 59.

13.    The Covered Actions seek to hold the Operator of the relevant Mariner Facility (Parkview or another Operator) liable for the alleged harm or wrongful conduct at that Mariner Facility, and to hold Mariner Central, as well as various other Non-Debtor Affiliates that are not Operators, liable for such alleged harm or wrongful conduct either directly or under assorted control person, aiding and abetting, and alter ego theories.  Owen Decl. ¶ 11.

14.    For example, a complaint alleging harm to a former resident (Case No. CV2200662) alleges, among other things, that Mariner Central and the relevant Operator are "alter-egos of one another" and that Mariner Central "directed and participated in every aspect of the delivery of care" to that individual.  Owen Decl. Ex. B.  Another complaint (Case No. 22CV393351) alleges that Mariner Central, together with the relevant Operator and other Non-Debtor Affiliates, had "joint control over the business operations of the skilled nursing facility" and were "knowing agents, joint venturers and/or alter-egos of one another."  Owen Decl. Ex. C.

15.    The claims in the Covered Actions are dependent on, and interwoven with, the Debtors' alleged conduct as the Covered Actions generally allege wrongful conduct and/or inadequate staffing at the Parkview Facility or other Mariner Facility as applicable, with such conduct or violations allegedly controlled by Debtor Mariner Central, causing harm or damages to the respective Defendant.  Owen Decl. ¶¶ 11, 14.   For example, claims related to a resident developing a wound, sustaining a fall with significant injury, or malnutrition and weight loss uniformly allege that Debtor Mariner Health Central controlled the amount of staff (nurses and nursing assistants) scheduled to work and would not authorize additional staff.  *Id.*

16.    Similarly, claims related to wage or employment practices allege that Debtor Mariner Central was the employer for all or part of the period at issue or otherwise took or controlled the relevant actions or policies.  Owen Decl. ¶¶ 11, 15.  For example, a complaint for

disability discrimination (CVPS2200407) alleges that "[Mariner Central] and [the Operator] rejected the doctor's note [plaintiff] presented . . . [Mariner Central] and [Operator] therefore unlawfully refused to accept the doctor's note and recommendations . . ."  Owen Decl. Exh. E.

17.    The Ledesma Action, which precipitated the commencement of these Chapter 11 Cases, illustrates how the allegations relating to any Mariner Facility carry potential exposure for Mariner Central.  Despite being based on various injuries and claims arising at the Parkview Facility, that action resulted in an award against Mariner Central and in an amount vastly exceeding the award against the actual Operator (approximately $8.9 million and $6 million, respectively). Owen Decl. ¶ 16.  Each of the Covered Actions, whether arising from or relating to the Parkview Facility or another Mariner Facility, seeks to assert similar claims and theories of liability against Debtor Mariner Central and presents similar risks to its estate.  Owen Decl. ¶¶ 16, 17.

**C.    The Debtors' Indemnification Obligations**

18.    Debtor Mariner Central is contractually obligated under each Support Agreement to indemnify and defend its counterparty Operator and such Operator's managers, employees, affiliates for any and all claims and losses incurred in connection with any breaches or failures by Mariner Central of its obligations, or any negligent act, willful omission or fraud by Mariner Central.  Specifically, each Support Agreement requires that:

> [Mariner Central] shall indemnify and hold Operator and Operator's officers, directors, equity holders, members, managers, employees and affiliates harmless from any and all claims, losses, judgments, damages, expenses and liabilities whatsoever (including reasonable attorneys' fees) incurred by any of them in connection with, by reason of, or arising out of: (a) the breach or failure of any obligation of [Mariner Central] that is contained in this Agreement or (b) any third party claims which are caused by [Mariner Central] in whole or in part through any negligent act, willful omission, [or] fraud . . .

Support Agreement § 6.1.

19.     In addition, the Mariner Central certificate of incorporation and bylaws both provide for indemnification and advancement to all persons made party or otherwise involved in any action by reason of being a current and former director and officer of Mariner Central or its predecessors, or by reason of service as a director, officer, employee or agent of any other entity at the request of Mariner Central.  Owen Decl. ¶ 25.

**D.      The Discovery and Litigation Burdens on the Debtors**

20.     The Covered Actions were commenced between April 2020 and July 2022.  Each of the Covered Actions presently remains in the initial motion practice or early discovery stages. Owen Decl. ¶ 18.

21.     The discovery for any Covered Action will be significant.  For example, claims brought under the California Elder Abuse Act routinely cause voluminous discovery to be served and responded to and/or motions for protection to be filed.  Owen Decl. ¶ 19.  Routine discovery demands run into the hundreds of document categories and interrogatories including wide-scale email searches.  *Id.*  Upon completion of the initial written discovery phase, depositions numbering on average between 10-14 depositions per case of employees and former employees are undertaken which requires extensive witness preparation and the costly and time-intensive burden to respond would inevitably fall heavily on the Debtors' personnel.  *Id.* In addition, two of the Covered Actions (Case Nos. CVRI2103380, CVPS2104890) are class actions brought on behalf of the plaintiff and similarly situated employees of the applicable Mariner Facility that will require particularly broad discovery.  *Id.* The discovery burdens are heightened further by the allegations of alter ego/control liability of the Covered Actions.  *Id.*

22.     Much, if not most, of the information necessary to prosecute or defend the Covered Actions, such as patient records, billing statements, financial and administrative records or relevant

emails, is within the possession or control of Mariner Central.  Owen Decl. ¶ 20.  For example, Mariner Central is responsible for, and contracts with third parties to obtain, data and records storage.  Owen Decl. ¶ 8.  Indeed, the substantial majority of relevant information is likely to be within the possession or control of Mariner Central.  Owen Decl. ¶ 20.

23.    Further, many of the persons most knowledgeable regarding the allegations of the Covered Actions, particularly with respect to the "alter ego" or "control" allegations, will be current or former employees of Mariner Central.  Other current or former employees of Mariner Central will also have relevant information or knowledge regarding the various allegations of the Covered Complaints, from staffing practices to employment policies.  Owen Decl. ¶ 21.

24.    In addition, the Operators rely on Mariner Central to provide in-house legal services and to coordinate with and oversee external counsel in addressing litigation and responding to discovery requests.  Owen Decl. ¶¶ 8, 22.  The Operators do not have an internal in-house legal function or the capability to respond to discovery requests, oversee outside counsel or otherwise manage a defense of legal actions or proceedings.  *Id.* ¶ 22.  Accordingly, the Operators rely on Mariner Central to manage and coordinate defense of the Covered Actions.

25.    If the Covered Actions proceed, the burden to respond to discovery, oversee outside counsel and manage the defense of the Non-Debtor Affiliates will be borne by Mariner Central personnel.  Owen Decl. ¶ 23.  Such efforts would consume significant time and resources, distract key Mariner Central personnel from duties relating to these Chapter 11 Cases, and interfere with the Debtors' ability to restructure successfully.  *Id.*

E.    **The Debtors' Reorganization Efforts**

26.    The Debtors have businesses that are generally profitable on an operating basis, have unencumbered assets and no secured creditors, are generally paying their bills as they come

due, and have a relatively limited set of creditors and claims.  *See* Perkins Decl. ¶¶ 15, 18, 37.

While the Debtors lack the ability to satisfy all claims asserted against them in full after recent

adverse litigation developments, with the benefit of the automatic stay and a breathing spell from

litigation, the Debtors expect to be able to formulate a plan of reorganization that preserves

operations, protects patients, has creditor support, and otherwise satisfies the requirements of the

Bankruptcy Code for confirmation.  *See* Perkins Decl. ¶¶ 15, 33, 34; Owen Decl. ¶ 27.  The Debtors

are working towards formulating and filing a plan of reorganization within weeks.

## RELIEF REQUESTED

27.     The Debtors seek a declaratory judgment, pursuant to sections 105(a), 362(a)(1)

and 362(a)(3) of the Bankruptcy Code, extending the automatic stay to prevent the Defendants

from continuing to prosecute the Covered Actions, or in the alternative, enjoining the continued

prosecution of the Covered Actions pursuant to section 105(a) of the Bankruptcy Code, in either

instance during the pendency of the Chapter 11 Cases.

## BASIS FOR RELIEF REQUESTED

28.     Section 362 of the Bankruptcy Code automatically stays "the commencement or

continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that

was or could have been commenced before the commencement of the case under this title, or to

recover a claim against the debtor that arose before the commencement of the case under this title,"

as well as "any act to obtain possession of property of the estate or of property from the estate or

to exercise control over property of the estate."  11 U.S.C. §§ 362(a)(1), (3).

29.     As stated by Congress:

> The automatic stay is one of the fundamental debtor protections
> provided by the bankruptcy laws. It gives the debtor a breathing
> spell from his creditors. It stops all collection efforts, all harassment,
> and all foreclosure actions. It permits the debtor to attempt a

repayment or reorganization plan, or simply to be relieved of the
financial pressures that drove him into bankruptcy.

The automatic stay also provides creditor protection. Without it,
certain creditors would be able to pursue their own remedies against
the debtor's property. Those who acted first would obtain payment
of the claims in preference to and to the detriment of other creditors.
Bankruptcy is designed to provide an orderly liquidation procedure
under which all creditors are treated equally.

H.R. Rep. No. 95-595, 340, 95th Cong., 1st Sess. (1977).

30.     The automatic stay implements "the Bankruptcy Code's goal of providing the

debtor with a breathing spell from creditors in order to permit the debtor to attempt repayment or

reorganization." *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1074 (3d Cir. 1992); *In re Midway Games,*

*Inc.*, 428 B.R. 327, 333 (Bankr. D. Del. 2010) (the automatic stay is designed "to provide the

debtor and its executives with a reasonable respite from protracted litigation, during which they

may have an opportunity to formulate a plan of reorganization for the debtor").

A.     <u>The Automatic Stay Should Be Extended</u>

31.     The Bankruptcy Code expressly authorizes the issuance of "any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §

105(a)(1).  "Consistent with congressional intent and with the fundamental purposes underlying

the automatic stay, numerous federal courts have held that, under appropriate circumstances, the

automatic stay may be extended beyond direct actions against the debtor to lawsuits against non-

debtors." *Midway Games*, 428 B.R. at 333.

32.     Such circumstances include "where stay protection is essential to the debtor's

efforts of reorganization," *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997),

"when a claim against the non-debtor will have an immediate adverse economic consequence for

the debtor's estate," *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003), or "when

there is such identity between the debtor and the third-party defendant that the debtor may be said

to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986); *see also Midway Games*, 428 B.R. at 334 ("Courts in this Circuit and others have held that [] the automatic stay . . . is properly extended to actions against non-debtors where an "identity of interest" exists between the debtor and non-debtor defendant such that the debtor is the real party defendant and the litigation will directly affect the debtor and, more specifically, the debtor's assets or its ability to pursue a successful plan of reorganization or liquidation under Chapter 11."). Without such extensions of the automatic stay, "Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." *In re Calpine Corp.*, 354 B.R. 45, 49 (Bankr. S.D.N.Y. 2006) (quotation omitted).

33.     Accordingly, the automatic stay has been extended to non-debtors where the debtor is obligated to indemnify the non-debtor or otherwise would suffer from an adverse litigation outcome. *See, e.g., Queenie*, 321 F.3d at 287-88 (where the non-debtor was wholly owned by the debtor); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992) (where the debtor had a duty to indemnify its executives and to reimburse their legal costs); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-51 (Bankr. D. Del. 1994) (where the debtor had a duty to indemnify and where there was a risk of collateral estoppel).   The automatic stay has also been extended where the subject litigation threatens to divert the attention of a debtor's key personnel from the reorganization efforts. *See, e.g., Majestic Star Casino v. City of Gary (In re Majestic Star Casino, LLC),* No. 10-50841(KG), 2010 WL 2540457 at *2 (Bankr. D. Del. Apr. 24, 2010) (extending the automatic stay where not doing so "will directly and significantly interfere with the Debtors' reorganization efforts because senior management will have to defend themselves"); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990)

(extending the automatic stay to a debtor's chairman based on the fact he was essential to the debtor's reorganization); *In re Sudbury, Inc.*, 140 B.R. 461, 465 (Bankr. N.D. Oh. 1992) (irreparable harm results when resources of debtor are consumed in third-party litigation).

34.     This Court should extend the automatic stay pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code to enjoin the continued prosecution of the Covered Actions against the Non-Debtor Affiliates during the pendency of these Chapter 11 Cases.  As set forth below, there is an identity of interest between the Debtors and the Non-Debtor Affiliates with respect to the Covered Actions such that allowing its continuation against the Non-Debtors Affiliates is tantamount to allowing its continuation against the Debtors.  The continued prosecution of the Covered Actions exposes the Debtors to significant estoppel, preclusion, and evidentiary prejudice; to burdensome discovery and litigation obligations that would consume significant time and resources, distract their management, negate the benefits of the automatic stay, and jeopardize their ability to restructure successfully; to substantial indemnification and advancement claims that would significantly harm the estate and creditors; and to the depletion of any shared insurance coverage that otherwise could be available to the Debtors for the benefit of their estates.  Allowing the Covered Actions to proceed against the Non-Debtor Affiliates will greatly impair the Debtors' prospects for a successful reorganization.  Accordingly, extending the automatic stay to the continuation of the Covered Actions against the Non-Debtor Affiliates is necessary or appropriate to all the Debtors a breathing spell from creditors and litigation pressures to pursue reorganization.

### i.        *Allowing the Covered Actions to Continue will Heavily Prejudice the Debtors*

35.     Courts have long recognized that extension of the automatic stay to non-debtors is appropriate where "there is such identity between the debtor and the third-party defendant" that a

finding or "judgment against the third- party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins*, 788 F.2d at 999; *see also In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990) ("a stay should be provided to codefendants when the claims against them and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding.").

36.     The conduct alleged in the Covered Actions at any Mariner Facility is inextricably interwoven with the conduct of Mariner Central in its provision of administrative, clinical and operational support services to the relevant Operators.  Any finding of liability against a Non-Debtor Affiliate for inadequate staffing or training, for example, would necessarily include a finding that Mariner Central acted wrongfully in its provision of related services to the relevant Operator.  Further, any finding that a Non-Debtor Affiliate was an alter ego of, was controlled by or in a joint venture with Mariner Central (or other Non-Debtor Affiliates acting through or with the involvement of Mariner Central) as claimed by the Covered Actions would necessarily require adverse findings regarding Mariner Central itself.

37.     Given the extensive overlap between the Debtors and the Non-Debtor Affiliates with respect to the Covered Actions allegations, any decisions against the Non-Debtor Affiliates – whether decisions on discovery disputes, dispositive motions, factual findings, evidentiary or procedural questions, liability or damages – would necessarily have estoppel, preclusive or prejudicial effect for subsequent litigation against Mariner Central and effectively would be decisions against Mariner Central.

38.     Examples of this have already begun arising in the Covered Actions since the commencement of these Chapter 11 Cases.  For example, since the commencement of these Chapter 11 Cases, the plaintiffs in that Covered Action with case no. 22CV012984 have already

cited and relied on deposition testimony by Mariner Central employees in the Ledesma Action in opposing certain relief requested by Non-Debtor Affiliates therein to support a theory of "supervisory liability" against Mariner Central and its employees.  *See* Owen Decl. Exhs. E, F.

  *ii.*    ***Allowing the Covered Actions to Continue Will Heavily Burden the Debtors***

  39.  Each of the Covered Actions presently remains in the initial motion practice or early discovery stages.   Owen Decl. ¶ 18.  Each Covered Action will involve extensive document discovery and depositions.  Much, if not most, of the information necessary to prosecute or defend the Covered Actions, such as medical charts, billing statements, financial and administrative records, or relevant emails is within the possession or control of Mariner Central and not of the Operators.  Owen Decl. ¶ 20.  For each Covered Action, multiple Mariner Central employees will be identified as part of the initial disclosures and will be deposed in the discovery process.  Owen Decl. ¶ 21.  Further, because the Covered Actions deal with different Mariner Facilities, disparate injuries and damages claims, and varying groups of defendants, much of the discovery will not be broadly reusable across the Covered Actions, necessitating such burdens to be incurred again and again.  Owen Decl. ¶ 19.   Thus, extensive discovery from Mariner Central is inevitable if the Covered Actions are allowed to continue.

  40.  The burden on the Debtors from allowing the Covered Actions to continue against Non-Debtor Affiliates is not limited to locating, reviewing and producing thousands upon thousands of pages of records or making tens of employees available for deposition (and indemnifying them as required by Mariner Central's organizational documents).  Rather, the Operators rely on Mariner Central to provide all in-house counsel and legal support services, including coordination with and oversight of outside counsel, and are not able to defend themselves against the Covered Actions without the services of Mariner Central.  Accordingly, if the Covered

Actions are allowed to continue against Non-Debtor Affiliates, Mariner Central will be forced to manage the Operators' defenses or face significant damages claims from the Operators.

41.     Such efforts will inevitably impose a costly and time-intensive burden on the Mariner Central officers and in-house legal team and will rob their attention from efforts to stabilize operations, pursue appeals from the Ledesma Action, preserve value for the Debtors' estates, evaluate creditor claims, and formulate a plan of reorganization. Owen Decl. ¶ 23. Simply put, allowing the Covered Actions to continue against the Non-Debtor Affiliates would leave Mariner Central with effectively the same litigation burdens as before it commenced its bankruptcy case. This would frustrate the purposes of the Bankruptcy Code by robbing Mariner Central of the breathing spell to pursue reorganization and formulate a restructuring plan.

### iii.     Mariner Central is Obligated to Indemnify the Operators

42.     The Covered Actions assert claims against Mariner Central for actions or failures relating to its obligations under the Support Agreements or other conduct. The various personal injury claims rest on allegations of inadequate care and staffing as being controlled by Mariner Central, and likewise the various wage or employment practices claims rest on allegations that Mariner Central controlled the relevant policies or actions. Owen Decl. ¶¶ 11, 14, 15. As Mariner Central is responsible for payroll, training and other human resources services for each Operator that are central to each Covered Actions, the claims alleged in the Covered Actions are readily within Mariner Central's indemnification and advancement obligations to the Operators and their personnel under the Support Agreements. *Id.* ¶ 7. In addition, certain Covered Actions specifically name Mariner Central employees as defendants, which persons would also be entitled to indemnification and advancement by Mariner Central under its organizational documents. *Id.* ¶ 26. Even without express contractual indemnification obligations, as the party responsible for

various payroll and human resources services, including employee trainings, at issue in the Covered Actions, Mariner Central would be exposed to equitable indemnity or contribution claims from the Operators for liability in the Covered Actions.

43.     These obligations, including for costs of defense, potential settlements, and judgments, will be a significant burden on Mariner Central's estate.  Owen Decl. ¶ 26.  Such costs are expect to significantly increase as the Covered Actions progress into discovery, and all available insurance coverage has already been exhausted.  *Id.*  If Mariner Central is required to fund such costs from cash on hand, such costs will substantially harm the Debtors' estates and creditors and impair the Debtors' reorganization efforts.

**B.      In the Alternative, the Continuation of the Covered Actions Should be Enjoined**

44.     Alternatively, enjoining continuation of the Covered Actions on a temporary basis under section 105 is warranted so that the Debtors may avoid irreparable harm and pursue a reorganization for the benefit of all creditors and stakeholders.  11 U.S.C. § 105(a) (bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]").  Bankruptcy courts have employed this power to enjoin actions by creditors against non-debtors when doing so would protect the debtor's estate or its ability to reorganize.  *See, e.g., McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997) (bankruptcy court has the authority to enjoin an activity that threatens the reorganization process or impairs its jurisdiction over a case before it); *see also In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (affirming section 105(a) injunction precluding action against non-debtor and explaining that section 105(a) "extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully").

45.     To obtain an injunction under section 105, the debtor must show such relief is warranted under the traditional injunction factors as modified to fit the bankruptcy context.   Those factors are "(1) a likelihood of success on the merits; (2) that [the Debtor] would suffer irreparable harm if the injunction is not granted; (3) the extent to which the [non-movant] would suffer irreparable harm if the injunction was issued; and (4) whether the public interest will be harmed." *In re W.R. Grace & Co.*, 412 B.R. 657, 665 (D. Del. 2009).

### i.   *There is a Reasonable Likelihood that the Debtors Will Successfully Restructure*

46.     *In re Sudbury, Inc.*, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992) ("The courts in this circumstance have held that success on the merits is to be evaluated in terms of the likelihood of a successful reorganization.").   A reasonable likelihood of a successful reorganization exists where "the Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail – unless, of course, the acts sought to be enjoined cause it to fail."   *In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (explaining that "the Debtors have so far been successful in doing everything they've needed to do to date," and because they "have met the challenges they have faced so far, that is sufficient"); *accord In re Union Trust Phila., LLC*, 465 B.R. 765, 773 (Bankr. E.D. Pa. 2011), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011) (finding a reasonable likelihood of a successful reorganization where the debtor had obtained the use of cash collateral and was continuing to operate such that the "prospects for a successful reorganization remain viable"); *Sudbury,* 140 B.R. at 466 (finding a likelihood of success where "the Debtor is hard at work on a reorganization plan [and the objectors] do not suggest that Debtor's effort will fail.") *see also In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859-60 (6th Cir. 1992) (in affirming an injunction against continuation of state court litigation against non-debtors, concluding that the "likelihood of success" factor was satisfied by bankruptcy court's implicit finding, based on the

17

proceedings before it after one month in bankruptcy, that the debtor "had some realistic possibility of successfully reorganizing under Chapter 11").

47.    The Debtors generally operate on a positive cash flow basis and have no encumbered assets. Perkins Decl. ¶¶ 15, 18. As shown on the Debtors' list of top creditors, the Debtors have a diverse but relatively discrete set of claims and constituencies, including landlords, trade creditors, contract counterparties, residents, employees, judgment creditors, contingent litigation claims, and regulators. The Debtors have to date successfully weathered significant headwinds from the pandemic and related general economic and industry-specific adverse developments, so much so that they did not require postpetition financing to commence these Chapter 11 Cases. Perkins Decl. ¶¶ 33, 34, 37. It appears highly likely that the Debtors' estates and their creditors will realize greater value from the Debtors' continuation as a going concern rather than liquidating, *see* Perkins Decl. ¶ 36, and no party has sought to dismiss or convert these Chapter 11 Cases. The Debtors have successfully obtained their requested first day relief, have continued operating in the ordinary course, and intend to propose a plan of reorganization within weeks. Indeed, because the Debtors provide a valuable service for the community, and because the Debtors are viable on a go forward basis, it is likely that the Debtors will be able to garner support from key stakeholder constituencies for a reasonable plan of reorganization. Accordingly, the Debtors plainly have a reasonable likelihood of successfully reorganizing.

*ii.*        ***Continuation of the Covered Actions Will Irreparably Harm The Debtors***

48.    If the Covered Actions continue against the Non-Debtor Affiliates, the inevitable estoppel, preclusion and prejudice will irreparably harm the Debtors' ability to defend themselves in subsequent proceedings.

49.    The conduct alleged in the Covered Actions at any Mariner Facility is inextricably interwoven with the conduct of Mariner Central in its provision of administrative, clinical and operational support services to the relevant Operators, and the alter ego or control allegations are even more inextricably interwoven among the Non-Debtor Affiliates and Mariner Central. Accordingly, as set forth above, any decisions against the Non-Debtor Affiliates – whether decisions on discovery disputes, dispositive motions, factual findings, evidentiary or procedural questions, liability or damages – would necessarily have estoppel, preclusive or prejudicial effect for subsequent litigation

50.    Numerous courts have recognized that such developments constitute irreparable harm supporting a section 105(a) injunction. *See, e.g., In re Am. Film Techs., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) ("because of the identity of subject matter, issues and parties involved, the [subject litigation] squarely implicates [the debtor's] indemnification obligations and exposes it to collateral estoppel prejudice if it does not participate in that case. This conclusion justifies the invocation of Code § 105 to issue a preliminary injunction order"); *In re Adelphia Commc'ns*, 302 B.R. 439, 451 (Bankr. S.D.N.Y. 2003) ("The courts in this and other districts have repeatedly recognized that section 105 may be used to enjoin litigation against non-debtors where there is the potential threat of the debtor being collaterally estopped from asserting defenses if an adverse judgment is entered against the non-debtors."); *In re Calpine Corp.*, 354 B.R. at 50 ("In light of the identity of interest between [the debtor] and [the non-debtor], [the debtor] will suffer irreparable harm if the [third party litigation] continues through the risk of collateral estoppel and evidentiary prejudice …."); *Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 67 (S.D.N.Y. 1990) ("The threat of collateral estoppel would force [the debtor's key

personnel] to participate in the [action] … thus causing the corporation and its reorganization plan irreparable harm.").

51.     In addition, if the Covered Actions continue against the Non-Debtor Affiliates, the burden of discovery, and indeed the burden of overseeing and managing the defense of the Covered Actions, will inevitably fall on Mariner Central as discussed above.  These burdens will distract key Mariner Central personnel and will irreparably harm the Debtors' efforts to restructure.  *See In re Cont'l Airlines*, 177 B.R. 475, 481 n.6 (D. Del. 1993) ("In a bankruptcy context, irreparable harm may be discerned if the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort.") (quotation omitted); *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 412 (S.D.N.Y. 2007) (finding that the debtors "would suffer irreparable harm if [a key employee] were distracted from his responsibilities in order to participate in the [subject] litigation"); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-5358 (PKC), 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) (affirming injunction where "the logistical stress on [the debtor] from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the State Court Action threatened to irreparably impair the company's reorganization process"); *In re Lomas Fin. Corp.*, 117 B.R. at 67 (affirming injunction where the subject litigation "would serve as a distraction to key [debtor] personnel, thus causing the corporation and its reorganization plan irreparable harm").

52.     Finally, if the Covered Actions continue against the Non-Debtor Affiliates, the Debtors' estates will be irreparably harmed as obligations are incurred and value is lost on litigation expenses.  As discussed above, Mariner Central will incur significant indemnification and advancement costs if the Covered Actions continue against the Non-Debtor Affiliates.  *See In*

*re 1031 Tax Grp., LLC*, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008) (finding irreparable harm because "[i]f the [subject litigations] go forward, insurance proceeds recoverable by the estate from these wasting policies may be diminished by defense costs of the [non-debtor]"). Even more importantly, and also as discussed above, Mariner Central will incur significant indemnification and advancement costs if the Covered Actions continue against the Non-Debtor Affiliates. *See In re 1031 Tax Grp., LLC*, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008) (finding irreparable harm where "there is a substantial risk that the Debtors face liability for indemnification if the [subject litigations] are permitted to continue"); *In re Calpine*, 354 B.R. at 50 (finding irreparable harm "through the risk of collateral estoppel and evidentiary prejudice, a drain on its estate due to its indemnification obligations to [the non-debtor defendant] and a significant burden and distraction of key employees from its restructuring effort."). Such costs or obligations will greatly prejudice the Debtors' estates and impair the Debtors' reorganization efforts.

### iii.        The Balance of Harms Favors the Debtors

53.     As set forth above, the harm to the Debtors – from preclusive rulings, from indemnification and advancement claims, from the depletion of available insurance, from the cost and burden of responding to discovery and managing the defense of the Covered Actions, from the diversion of management away from restructuring efforts, and from the adverse impact on the Debtors' restructuring efforts – would be irreparable if this Court does not enjoin the Covered Actions against the Non-Debtor Affiliates.

54.     By contrast, there would be only de minimis harm at most to Defendants if the Covered Actions are enjoined. The Covered Actions are still in their preliminary stages, are years away from a final judgment, and moreover may be ultimately subject to a plan of reorganization. Defendants will suffer no prejudice from a limited delay in reaching a decision on the merits, let

alone a final judgment, and the harm to Defendants from such a delay – if any – cannot outweigh the potential harm to the Debtors from proceeding.  *In re Am. Film Techs.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (finding this factor to be "easily addressed" because "a further delay of limited duration will not cause [the opposing party] irreparable harm"); *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 413 (S.D.N.Y. 2007) ("The inability of [the defendant] to obtain a hypothetical recovery sooner rather than later is not a harm – and is certainly not an irreparable harm – sufficient to outweigh the irreparable harm that [the debtors] will suffer if the [] litigation were permitted to proceed.").

55.    Accordingly, the balance of harms weighs in favor of issuing an injunction against continuation of the Covered Actions against the Non-Debtor Affiliates.

### iv.        *An Injunction Serves the Public Interest*

56.    "In the context of bankruptcy proceedings, the "public interest" element means "the promoting of a successful reorganization."  *Am. Film Techs.*, 175 B.R. at 849 (quotation omitted); *see also In re Caesars Ent. Operating Co.*, 808 F.3d 1186, 1189 (7th Cir. 2015) (a section 105 injunction that is "likely to enhance the prospects for a successful resolution of the disputes attending [the] bankruptcy" is appropriate because "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives.").

57.    Enjoining the Covered Actions against the Non-Debtor Affiliates to avoid irreparable harm to the Debtors and facilitate a successful restructuring serves the public interest far more than allowing Defendants to continue pursuing their claims that are in the earliest stages of litigation.  This relief is necessary for the Debtors to successfully restructure and serves the public interest by promoting compliance with the Congressional purpose of the automatic stay and by facilitating the Debtors' reorganization efforts.  The public interest in the Debtors' successful

reorganization is particularly acute here in light of the Debtors' role in delivering quality, affordable health care services to historically underserved persons and communities.

## <u>RESERVATION OF RIGHTS</u>

58.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim by any person against the Debtors, or (ii) a waiver of any rights to dispute or defenses to any claim made in these Chapter 11 Cases or in the Covered Actions.  The Debtors also expressly reserve their right to assert that any action is subject to 11 U.S.C. § 362(a).

59.     Without limiting the foregoing, the Debtors note that, since the commencement of these Chapter 11 Cases, certain Defendants have attempted to avoid the automatic stay by dismissing Mariner Central from the applicable Covered Action.  Owen Decl. ¶ 28.  Such attempts to evade the jurisdiction of this Court will not be successful and the dismissal of Mariner Central as a named defendant from any Covered Actions has little or no relevance to the arguments set forth herein.  In particular, Mariner Central would continue to bear the burden of discovery in and defending against such Covered Action, would continue to suffer from the diversion of key personnel from crucial restructuring efforts on account of such Covered Action, would continue to incur significant indemnification and advancement liabilities or other depletion of estate assets on account of such Covered Action, and would continue to face estoppel, preclusive or other prejudicial effect from adverse findings in future litigation against Mariner Central.  The Debtors reserve all of their rights with respect to any such attempted dismissal, including but not limited to the right to seek dismissal of the Covered Action on account of Mariner Central being an indispensable party to such action.

## **NOTICE**

60.     The Debtors will serve a copy of this Motion and supporting declarations on the Defendants or their counsel in the Covered Actions or these Chapter 11 Cases, the U.S. Trustee, all parties on the Debtors' consolidated list of 30 largest unsecured creditors, and all parties entitled to notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.

*[ remainder of page intentionally left blank ]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached as **Exhibit 2**, extending the automatic stay to stay the continued prosecution of the Covered Actions against the Non-Debtor Affiliates, or in the alternative enjoining the continuation of the Covered Actions as against the Non-Debtor Affiliates, during the pendency of these Chapter 11 Cases and granting such other and further relief as the Court deems just and proper.


Dated: October 4, 2022
      Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    tcairns@pszjlaw.com
    mcaloway@pszjlaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)
Carollynn H.G. Callari (*pro hac vice*)
David S. Forsh (*pro hac vice*)
**RAINES FELDMAN LLP**
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019-4801
Telephone:    (917) 790-7100
Email:    hrafatjoo@raineslaw.com
    ccallari@raineslaw.com
    dforsh@raineslaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*