# EXHIBIT B

**COPY**

Gregory L. Johnson, No. 177889
Jody C. Moore, No. 192601
Joanna Hutchins, No. 307058
**JOHNSON MOORE**
100 E. Thousand Oaks Blvd, Suite 229
Thousand Oaks, CA 91360
Telephone:    805-988-3661
Facsimile:    805-494-4777

Attorneys for Plaintiffs

**FILED**

MAR 15 2022

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: J. Chen, Deputy

**BY FAX**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF MARIN

TRACY JACKSON by and through her
Successor in Interest, AVIS DEWALT; and
DAVONTE BARFIELD, individually,

Plaintiffs,

vs.

SAN RAFAEL OPERATING COMPANY LP
dba PINE RIDGE CARE CENTER;
MARINER HEALTH CENTRAL, INC.; and
DOES 1-25, inclusive,

Defendants.

CASE NO.: **2 2 0 0 6 6 2**

**COMPLAINT FOR DAMAGES:**
1. **Dependent Adult Abuse and Neglect
   (Welf. & Inst. Code, § 15600, *et seq.*)**
2. **Violation of Resident Rights (Health
   & Saf. Code, § 1430(b))**
3. **Negligence**
4. **Wrongful Death**

Plaintiffs allege as follows:

## PARTIES

1. **Plaintiff:** Plaintiff TRACY JACKSON ("MS. JACKSON") was born on March 10, 1965 and died on August 22, 2021. At all times relevant herein, MS. JACKSON was a resident of the State of California, County of Marin.

2. **Elder:** At all times relevant herein, MS. JACKSON was a "dependent adult" as defined by Welfare and Institutions Code section 15610.23 and had physical and mental limitations restricting her ability to carry out normal activities and protect her rights as discussed more fully *infra.*

3. **Successor in Interest:** Plaintiff AVIS DEWALT (hereinafter "MS. DEWALT") is the sister of MS. JACKSON. MS. DEWALT brings the claims of Dependent Adult Abuse and Neglect and Violation of Resident Rights on behalf of MS. JACKSON in MS. DEWALT's capacity as Successor in Interest. A Declaration of Standing pursuant to Code of Civil Procedure section 377.32 is being filed concurrently herewith.

4. **Heirs:** DAVONTE BARFIELD brings his Wrongful Death claims in his individual capacity as the lawful heir of MS. JACKSON.

5. **SNF Licensee**: Defendant SAN RAFAEL OPERATING COMPANY LP ("SAN RAFAEL OPERATING COMPANY" or "LICENSEE") is limited partnership licensed to do business in the State of California. SAN RAFAEL OPERATING COMPANY holds the license to operate a Skilled Nursing Facility ("SNF") and does so under the business name of PINE RIDGE CARE CENTER ("PINE RIDGE CARE CENTER" or "FACILITY") located at 45 Professional Center Parkway, San Rafael, CA 94903.

6. **Licensee Duties**: SAN RAFAEL OPERATING COMPANY is responsible for compliance with licensing requirements and the organization, management, operation, and control of the FACILITY. The general duties of a licensee are set forth in Title 22 of the California Code of Regulations section 72501. Certain duties are non-delegable including the responsibility for compliance with regulations and the management and control of the Skilled Nursing Facility. Delegation of authority by a licensee shall not diminish the responsibilities of the licensee. Therefore, even where a LICENSEE delegates operational control to another person or entity, that LICENSEE remains directly liable for management, operation, and control of the FACILITY. (Cal. Code Regs., tit. 22, § 72501(a).)

7. SAN RAFAEL OPERATING COMPANY was subject to the requirements of federal and state laws and regulations that govern the operation of a Skilled Nursing Facility in California. In connection with its operation of the facility, SAN RAFAEL OPERATING COMPANY has a

2

1  substantial and ongoing caretaking and custodial relationship involving ongoing responsibility

2  for the basic needs of its residents, including MS. JACKSON.

3      8.  By law, the LICENSEE of SNFs operating in California must delegate to a designated

4  administrator, in writing, the authority to organize and carry out the day-to-day functions of the

5  SNF.  During MS. JACKSON's admission to the FACILITY, the FACILITY had an

6  Administrator, believed to be Henry Brumley, who was responsible for the administration and

7  management of the SNF in accordance with Title 22 of the California Code of Regulations

8  section 72513.  The FACILITY also had a Director of Nursing, believed to be Melijoy Adan,

9  who was responsible for the administration and management of the SNF in accordance with Title

10  22 of the California Code of Regulations section 72327.  The Administrator and Director of

11  Nursing were managing agents of the LICENSEE and had care or custody of MS. JACKSON.

12      9.  The Administrator and Director of Nursing of the FACILITY were vested with sufficient

13  authority and discretion in making decisions that would ultimately affect corporate policy,

14  including writing, approving, and implementing patient care and administrative policies and

15  procedures, making decisions regarding budget, allocation of resources, staffing, hiring, firing,

16  training, and other aspects of day-to-day operations, such that they were also the managing

17  agents of the owner/operator SAN RAFAEL OPERATING COMPANY.

18      10. SAN RAFAEL OPERATING COMPANY had the duty to employ an adequate number

19  of qualified personnel to carry out all the functions of the SNF.  (Health & Saf. Code, §

20  1599.1(a); Cal. Code Regs., tit. 22, § 72501(e).)  Adequate staffing is essential to proper patient

21  care and outcomes.  There is no greater predictor of patient outcome in a skilled nursing facility

22  than understaffing.  The standard of care codified at Title 42 of the Code of Federal Regulations

23  parts 483.35 and 483.70(f) is to provide sufficient qualified nursing staff to provide nursing and

24  related services to attain or maintain the highest practicable physical, mental and psychosocial

25  well-being of each resident, as determined by resident assessments and plans of care.  Because

26  these requirements are codified in state and federal regulations, everyone involved in nursing

27

28  3

1  home operations, including the owners, operators, managers, administrators, and directors of

2  nursing in this case, understands the direct relationship between quality staff and patient

3  outcomes.

4     11. **Defendant MARINER HEALTH CENTRAL, INC.** (hereinafter "MARINER

5  HEALTH CENTRAL") is a Delaware corporation with its principal place of business at One

6  Ravinia Drive, Suite 1400 Atlanta, Georgia. At all times relevant herein, MARINER HEALTH

7  CENTRAL owned, managed, maintained, and/or controlled – in whole or in part – Defendant

8  PINE RIDGE CARE CENTER and approximately 20 other licensed skilled nursing facilities in

9  California. MARINER HEALTH CENTRAL is a parent/management company that was

10  substantially engaged in the ownership, leasing, control, management, staff, fiscal budgeting,

11  oversight, risk management, regulatory compliance, implementation and enforcement of policies

12  and procedures, consultation with and/or operation for the licensees, including PINE RIDGE

13  CARE CENTER OPERATING COMPANY, LP.

14     12. **Unity of Interest:** Upon information and belief, MARINER HEALTH CENTRAL and

15  the LICENSEE are alter-egos of one another and form part of a single enterprise. These

16  Defendants will collectively be known as the "MARINER DEFENDANTS".  There is sufficient

17  unity of interest and ownership among the MARINER DEFENDANTS such that the acts of one

18  are for the benefit of all and can be imputed to the acts of others.

19     13. On information and belief, MARINER HEALTH CENTRAL and the LICENSEE are

20  under common ownership, sharing a seamless flow of corporate officers. MARINER

21  DEFENDANTS, and each of them, were jointly responsible to ensure the FACILITY was

22  operated in full compliance with federal and state laws and regulations governing operations of a

23  SNF, and for all aspects of the organization, management, operation, and control of the

24  FACILITY.  MS. JACKSON's injuries arise out of the organization, management, operation,

25  and control of the FACILITY by the MARINER DEFENDANTS in their capacity as

26

27

4

28

1  owner/operators/managing agents of the FACILITY.  MARINER DEFENDANTS, and each of

2  them, share joint responsibility for MS. JACKSON's injuries.

3      14. MARINER DEFENDANTS treat the assets of one as the assets of all.  They make and

4  approve key decisions concerning the FACILITY's day-to-day operations, such as staffing

5  levels, employee hiring and firing, budgets and related issues, which decisions, and directives, on

6  information and belief, were made at the direction of and/or for the benefit of the MARINER

7  DEFENDANTS.

8      15. MARINER HEALTH CENTRAL directed and participated in every aspect of the

9  delivery of care to PINE RIDGE CARE CENTER's residents, including MS. JACKSON. PINE

10  RIDGE CARE CENTER is a captive nursing home, with no authority to go out and seek

11  "administrative" services from any company other than MARINER HEALTH CENTRAL.

12  MARINER HEALTH CENTRAL authorizes the staffing budgets and sets staffing levels; it hires

13  and fires the Administrator and Director of Nursing, it creates all the policies and procedures;

14  and it has its own officers and directors as members of the PINE RIDGE CARE CENTER

15  Governing body. To ensure quality of care and sufficient staffing, MARINER HEALTH

16  CENTRAL's own officers and directors do rounds at the facility, participate in stand-up

17  meetings, and participate in interdisciplinary discussions about resident care issues.  Finally,

18  MARINER HEALTH CENTRAL, INC. is a "related party", meaning it shares common

19  ownership and it shares in the profits.  All of PINE RIDGE CARE CENTER's money (daily

20  deposits for care) is swept out of its own bank account and into a corporate account daily.

21      16. Injustice will result if the Court does not disregard the fiction of the separate entities.

22  MARINER HEALTH CENTRAL misuses its corporate form to siphon funds from the

23  FACILITY.  They conceal and misrepresent the identity of the responsible ownership,

24  management, and financial interests of the MARINER DEFENDANTS.  They created a

25  fractured ownership and management structure in order to shield the MARINER

26  DEFENDANTS from liability and to carry out their single enterprise with financial impunity.

27

28  5

17.   The MARINER DEFENDANTS manage and control the FACILITY and make critical decisions regarding staffing budget and census, resulting in nurse staffing which falls below the legal minimum.  The MARINER DEFENDANTS benefit financially from the policies and procedures, decisions, control, and management of the FACILITY in the form of income and profits received from the FACILITY but hide behind the corporate structure to escape financial and legal liability arising from the very conduct they directed.

18. If the MARINER DEFENDANTS are not treated as a single enterprise or alter egos of each other, a severe injustice will result.  The MARINER DEFENDANTS caused staff levels to fall below the legal minimum and siphoned millions of dollars from the FACILITY, monies which were obtained through wholesale violations of the California's staffing laws.  Allowing the MARINER DEFENDANTS to avoid legal responsibility for actions taken at the FACILITY level, which they directed and caused, would be unfair and unjust.

19. **Advance Knowledge/Authorization/Ratification:**  Because of the unity of interest and common ownership and control alleged herein, the acts of the MARINER DEFENDANTS were done pursuant to policies, practices, procedures, written or otherwise, established and implemented by and with the advance knowledge, acquiescence, or subsequent ratification of the MARINER DEFENDANTS by and through its officers, directors and managing agents, including the Administrator and Director of Nursing.  The MARINER DEFENDANTS' process and plan of operating the FACILITY for the purpose of generation of revenue is the same process and plan engaged in by the MARINER DEFENDANTS in the operation of other SNFs under common ownership and control.

20. MARINER DEFENDANTS, and each of their tortious acts and omissions, as alleged herein, were done in concert and with each other and pursuant to a common design and agreement to accomplish a particular result, namely maximizing profits from the operation of the FACILITY.  MARINER DEFENDANTS, and each of them, implemented a business plan to underfund, understaff, undertrain, and undersupervise the staff at the FACILITY.

21. MS. JACKSON's injuries and subsequent death arise out of the organization, management, operation, and control of the FACILITY by and between MARINER DEFENDANTS in their capacity as owner/operators and Administrator and Director of Nursing as managing agents of the FACILITY.  As such, the MARINER DEFENDANTS share joint responsibility for MS. JACKSON's injuries and subsequent death as a result of the harm she suffered.

22. **DOES:** The true names and capacities of defendants named herein as DOES 1-25, inclusive, are unknown to Plaintiff, who therefore sue those defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and/or capacities and/or involvement of said fictitiously named defendants when ascertained.  Plaintiff is informed and believes, and thereon alleges, that each of the defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

23. On information and belief, DOES 1 through 20 are, and at all times mentioned herein owned, operated, managed, supervised, controlled, maintained, or were otherwise responsible for the business activities of SAN RAFAEL OPERATING COMPANY, LP.  Such DOES would include officers, directors, controlling shareholders, partners, and governing board members, persons in de facto control of healthcare, operators, or employees of SAN RAFAEL OPERATING COMPANY, LP.  At all times relevant to this action, DOES 1 through 10 helped set and enforce policies and procedures for the services rendered to clients of SAN RAFAEL OPERATING COMPANY, LP.

24. On information and belief, DOES 21 through 25 include persons directly or indirectly responsible for provision of care or services to MS. JACKSON, including but not limited to physicians, medical groups, managed care organizations, acute care hospitals, home health agencies, visiting nurses, therapists, or other ancillary care providers who saw, examined, evaluated, observed or treated or failed to treat MS. JACKSON for care or conditions relating to

7

1   the allegations in the Complaint, and/or persons having made representations or warranties to or

2   from the Department of Social Services, the Department of Public Health, the Long Term Care

3   Ombudsman, Adult Protective Services, SAN RAFAEL OPERATING COMPANY, LP,

4   MARINER HEALTH CENTRAL, INC., and/or anyone purporting to act on behalf of or in

5   concert with these persons or entities.  The identities of such persons or entities are unknown to

6   Plaintiff and Plaintiff will seek leave to amend when those identities are ascertained. Plaintiff is

7   informed and believes, and thereon alleges, that each of the defendants designated as a DOE is

8   responsible in some manner for the events and happenings herein referred to and thereby legally

9   caused the injuries and damages herein alleged.

10      25. Upon information and belief, Plaintiff further alleges that each Defendants and DOES 1-

11   25 were the agent, servant, employee, joint venture and/or partner of each Co-Defendant, and at

12   all times acted within the course and scope of said agency, employment, venture, and/or

13   partnership pursuant to the policies, practices, procedures, written or otherwise, and with the

14   advance knowledge, acquiescence, or subsequent ratification of each Co-Defendant.

15                              **JURISDICTION AND VENUE**

16      26. This Court has jurisdiction over the cause of action asserted.  The defendants have

17   sufficient minimum contacts in California based on their residency in California or otherwise

18   intentionally avail themselves of the California market though their provision of services in the

19   County of Marin, so as to render them essentially at home in California and making the exercise

20   of jurisdiction by the California courts consistent with traditional notions of fair play and

21   substantial justice.

22      27. Venue is proper in the County of Marin under Code of Civil Procedure section 395(a)

23   based on the facts, without limitation, that this Court is a court of competent jurisdiction, that the

24   defendants reside in the County of Marin, and that all of the events described occurred in the

25   County of Marin.

26

27

28                                    8

                        **COMPLAINT FOR DAMAGES**

## **GENERAL ALLEGATIONS**

28. MS. JACKSON became a resident of PINE RIDGE CARE CENTER on April 2, 2021. Her diagnoses upon admission included toxic-metabolic encephalopathy, traumatic brain injury, muscle weakness, dysphagia, and chronic anemia. As a result of her physical and cognitive condition on admission, she required nursing and custodial care and assistance with all of her activities of daily living including but not limited to turning and reposition, transferring in and out bed and chair, toileting assistance, maintain personal hygiene, eating, drinking, and managing her medication.

29. Patients like MS. JACKSON require individualized care and treatment to avoid certain custodial care issues from developing. Upon admission, the patient must be properly assessed to gather information to make decisions about suitable interventions to avoid individualized health risks. The care plan must set goals to provide benchmarks for evaluating whether the planned care interventions are actually working. The staff must assess and reassess the resident to determine whether the care plan goals are being met. If the interventions are not working, the care plan must be modified to include alternative treatment interventions. If the patient has a change of condition, he or she must be reassessed to determine if the care plan needs to be modified as a result of the resident's new condition and/or baseline. Care planning is an ongoing interdisciplinary process that is critical to patient outcomes.

30. For example, in dysphagic patients, malnutrition and dehydration is commonplace and often accelerated as a result of the patient's impaired ability to intake food and fluid. Treating dysphagia requires an interdisciplinary approach based on close monitoring of the hydration and nutritional status of the patient including the patient's intake and output of food and fluids. The patient's fluid status should be monitored in conjunction with the patient's dietary intake as fluid comes into the body through drinking, water in food, and water formed by oxidation of foods. The patient's urine color and amount should be assessed and if urine output is less than 30 ml/hour for two consecutive hours, this should be reported to the patient's family and physician.

Close monitoring of vital signs such as blood pressure and heart rates for hypotension and tachycardia should be implemented. The patient's weight should be monitored as this is the best assessment data for possible fluid volume imbalance and/or dehydration. If the patient is on psychotropic medications and benzodiazepines, this too should be monitored as these medications are known to increase the risk of dehydration in dysphagic patients.

31. Care planning to prevent wound development and promote healing is another such multidisciplinary process. Upon admission MS. JACKSON had clear skin but, because of her anemia, malnutrition, and dysphagia, was at a high risk for skin breakdown. To effectively prevent skin breakdown and promote healthy tissue development, a patient needs both custodial and ongoing skilled care. A person needs adequate assistance with turning, positioning, and pressure relief. A person needs adequate hygiene to keep susceptible areas clean and dry and free from urine and feces. A person needs dietary assessments, and food, fluid and supplements to make sure the metabolic demands of regenerating healthy tissue are met. If a wound develops, a person needs a wound care nurse specialist to clean and dress the wound. A person needs constant assessment by a registered nurse to evaluate whether the wound healing protocol is effective. In other words, an RN needs to assess whether the wound is getting better, worse or staying the same. A person needs someone to evaluate and arrange for needed medical equipment, such as a specialty bed, air-fluidized mattress, or other pillows, bolsters and wedges to accommodate pressure relief.

32. During her stay at PINE RIDGE CARE CENTER, however, staff did not provide MS. JACKSON with the care and treatment that she required, including nursing and therapy services. Specifically, Defendants failed to effectively develop, implement, and modify care plans for MS. JACKSON's individualized care needs.

33. **Wound Care Plans**: MS. JACKSON had no skin breakdown when she entered the FACILITY on April 2, 2021. But over the course of her residency at PINE RIDGE CARE CENTER, she developed severe Stage IV pressure ulcers on her sacrum and hip. This happened

10

because Defendants failed to implement a comprehensive wound prevention program including ongoing assistance with turning, positioning and pressure relief; ongoing assistance with hygiene to keep the affected area clean and dry and free from urine and feces; dietary assessments, and food, fluid and supplements to make sure the metabolic demands of a healing a pressure wound are met; ongoing assessment by a registered nurse to evaluate whether the wound healing protocol is effective and/or whether the wound is getting better, worse or staying the same; help arranging for needed medical equipment, such as a specialty bed, air-fluidized mattress, or other pillows, bolsters and wedges to accommodate pressure relief.

34. The severity of a bedsore is staged on a scale of I to IV. Stage I skin breakdown manifests as a reddened, painful area on the skin that does not turn white when pressed. A Stage I wound can, and should, be quickly healed. This is because everyone who cares for the elderly knows that a bedsore becomes life-threatening once it progresses to a Stage III or IV. A Stage IV wound is the most severe state of pressure ulcer, in which the wound has opened up, the tissue eaten away, exposing skin, muscle, and bone. In MS. JACKSON's case, her sacral wound went so deep that her tendon was exposed. Stage IVs carry huge risks of infection as a result of the open site. They are excruciatingly painful and once a wound gets to this stage, it is extremely difficult to fully heal. Thus, prevention is extremely important.

35. **Food and Fluid Care Plans:** Defendants failed to implement a comprehensive care plan to ensure MS. JACKSON received adequate food, fluids, and supplements to prevent malnutrition and dehydration and promote wound healing including assessing for signs and symptoms of malnutrition; monitoring her intake and output; and implementing interventions to improve nutritional status. They failed to track her intake and output as required by her care plans. They failed to accurately document her functional limitations and need for assistance – for example, they repeatedly documented that she had no difficulty swallowing, despite the fact that she had been diagnosed with dysphagia and required a pureed diet, and they repeatedly documented that she did not require any assistance with eating even though she required 1:1

11

feeding assistance.  As a result of these failures, MS. JACKSON did not receive the fluids and nutrients that she needed, and her condition declined. She was hospitalized twice for dehydration - first by Marin Hospital on May 4-6 2021, and then by Kaiser Hospital May 5-14, on which occasion her dehydration was documented as being "severe."

36. **Infection Care Plans:** Defendants failed to implement a comprehensive care plan to ensure MS. JACKSON did not develop any infections including assessing and reporting for signs and symptoms of infection; and implementing interventions to reduce the risk for infection like maintaining fluid and nutritional intake, prevent urinary retention, and keep her free of urine and feces. As a result, she developed a urinary tract infection.

37. **Hygiene Care Plans**: Defendants failed to implement a comprehensive care plan to promote and maintain good personal hygiene including keeping the patient clean, and free of urine and feces. At one point, she was discovered to have black bugs in her hair and on her body.

38. On August 10, 2021, MS. JACKSON had a choking episode and was unable to breathe. Facility staff suctioned her and approximately 1 liter of pureed food material was removed from her mouth. 911 was called and the paramedics transferred her to the hospital.

39. At the hospital, MS. JACKSON was given oxygen and diagnosed with aspiration pneumonia, urinary tract infection, and hypernatremia (high sodium, usually associated with dehydration). She was

40. MS. JACKSON was admitted to the hospital but given a poor prognosis. Two days later she was placed on comfort care. She ultimately died on August 22, 2021, from acute hypoxic respiratory failure and aspiration pneumonia. Her death was a direct and proximate result of the poor care she received at PINE RIDGE CARE CENTER.

///

///

///

///

**COMPLAINT FOR DAMAGES**

## FIRST CAUSE OF ACTION

### (Elder Abuse and Neglect by Plaintiff TRACY JACKSON, by and through her Successor in Interest, AVIS DEWALT, as against all Defendants)

41. Plaintiff incorporates by reference Paragraphs 1 through 40 of this Complaint as though fully set forth.

42. **Elder:** MS. JACKSON, at all relevant times herein, was over the age of 65 and thus, an "elder" as that term is defined in Welfare & Institutions Code section 15610.27.

43. **Dependence on Staff for All Care Needs:** At the time of her admission had toxic-metabolic encephalopathy, traumatic brain injury, muscle weakness, dysphagia, and chronic anemia. As a result, she required nursing and custodial care and assistance with all of her activities of daily living including but not limited to turning and reposition, transferring in and out bed and chair, toileting assistance, maintain personal hygiene, eating, drinking, and managing her medication.

44. **Substantial Ongoing Caretaking and Custodial Relationship:** MS. JACKSON was not able-bodied and unable to take care of her own needs during the time she was under the care and custody of the MARINER DEFENDANTS, and each of them. Accordingly, the MARINER DEFENDANTS, and each of them, had a substantial ongoing caretaking and custodial relationship with MS. JACKSON while she was a resident at the FACILITY. MS. JACKSON was dependent on the MARINER DEFENDANTS, and each of them, for all of her custodial and other care needs.

45. **Knowledge of Vulnerable Resident Population:** Each resident of PINE RIDGE CARE CENTER is an elder and/or dependent adult as defined by Welfare & Institutions Code sections 15610.23 and 15610.27, respectively. Defendant knew or should have known that their conduct, as described herein, was directed to one or more elder and/or dependent adults. Because of her age, condition, and disability, MS. JACKSON was substantially more vulnerable to the conduct of Defendant, than other members of the public.

46. **Duties of PINE RIDGE CARE CENTER:** Because  accepted and retained MS. JACKSON as a resident, they owed a duty to MS. JACKSON to act reasonably in the discharge of their duties and to not willfully or recklessly ignore MS. JACKSON's medical care needs or cause unnecessary suffering.  Without limiting the foregoing,  owed the following duties to MS. JACKSON:

    a.  Duty to treat residents with consideration, respect, and full recognition of dignity (Cal. Code Regs., tit. 22, § 72527(a)(12));

    b.  Duty to identify individualized individual care needs based on assessment of patient's needs with input from patient and, if necessary, health professionals involved in the care of the patient (Cal. Code Regs., tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 483.10(f), 483.20(b)(1); 42 U.S.C. § 1395i-3(b)(3));

    c.  Duty to provide care as implemented by individualized written patient care plan indicating the care to be given, objectives to be accomplished, and the professional discipline responsible for each element of care (Cal. Code Regs., tit. 22, § 72311(a)(1)(B); 42 C.F.R. § 483.10(c));

    d.  Duty to review, evaluate, and update patient care plans as necessary and more often if there is a change of the patient's condition (Cal. Code Regs., tit. 22, § 72311(a)(1)(C));

    e.  Duty to provide care as implemented by the patient care plan according to the methods indicated (Cal. Code Regs., tit. 22, § 72311(a)(2); 42 U.S.C. § 1395i-3(b)(4));

    f.  Duty to provide care pursuant to physician's orders in the administration of medication and/or treatment, to provide medication and treatment as prescribed, and prepare a record of the administration of medication and treatment (Cal. Code of Regs., tit. 22, §§ 72313 (a)(1)-(2) and (c));

    g.  Duty to record nurses' notes that are clear and legible, dated and signed, among other qualifications, including narratives or how a patient responds, eats, drinks, looks, feels, and reacts (Cal. Code Regs., tit. 22, § 72547(a)(5));

14

h.  Duty to provide the resident or responsible party with the opportunity to participate in an immediate and ongoing basis in the total plan of care including identification of medical, nursing, and psychosocial needs and the planning of related services (Cal. Code Regs., tit. 22, § 72527(a)(3); 42 C.F.R. § 483.10(c));

i.  Duty to notify physician of any change of condition and to note all attempts to notify physician in patient's health record (Cal. Code Regs., tit. 22, § 72311(a)(3) and (b));

j.  Duty to provide care in such a manner and in such an environment to prevent formation and progression of pressure ulcers including turning and repositioning; using pressure-reducing devices where indicated; provide care to maintain clean, dry skin free of feces and urine; and carry out physician orders for treatment of ulcers (Cal. Code Regs., tit. 22, § 72315(f); Health & Saf. Code, § 1599.1(b));

k.  Duty to provide adequate personal hygiene, nutrition, and fluids to prevent malnutrition, dehydration, and promote wound healing (Cal. Code of Regs., tit. 22, §§ 72315(d)(g)(h); Health & Saf. Code, § 1599.1(b));

l.  Duty to provide adequate care and treatment to prevent the development and progression of infections (Cal. Code Regs., tit. 22, § 72321(b));

m.  Duty to provide pharmaceutical and physical therapy services for effective pain management (Cal. Code Regs., tit. 22, §§ 72355, 72403(b)(3));

n.  Duty to provide care in such a manner and in such an environment by facility staff to be free from mental and physical abuse and neglect (Cal. Code Regs., tit. 22, § 72527(a)(10); 42 C.F.R. § 483.12);

o.  Duty to provide adequate number of qualified personnel to carry out all functions of the facility and to meet patients' needs as well as adequate training and competent supervision (Cal. Code of Regs., tit. 22, §§ 72329 and 72329.1; Health & Saf. Code, § 1599.1(a); 42 C.F.R. §§ 483.35, 483.95).

15

**COMPLAINT FOR DAMAGES**

47. **Duties of MARINER HEALTH CENTRAL:** As alleged above, SAN RAFAEL OPERATING COMPANY is a mere shell of MARINER HEALTH CENTRAL and is the managing agent of MARINER HEALTH CENTRAL. SAN RAFAEL OPERATING COMPANY is a wholly owned subsidiary and MARINER HEALTH CENTRAL directs SAN RAFAEL OPERATING COMPANY's day-to-day operations. By virtue of this agency relationship, MARINER HEALTH CENTRAL also owed the duties identified in Paragraph 46 (a)-(o) to MS. JACKSON.

48. In addition, and without limiting the generality of the foregoing, MARINER HEALTH CENTRAL, as owners and operators of SAN RAFAEL OPERATING COMPANY owed the following duties to MS. JACKSON: to implement policies and procedures to ensure resident care needs are met; to provide training on the policies and procedures to ensure resident care needs are met; to ensure physicians care is provided; to plan a budget whereby staffing levels are adequate; to allocate sufficient resources to the FACILITY; to staff the FACILITY in both quantity and quality caregivers; and to comply with state and federal laws and regulations pertaining to SNFs.

49. **Physical Abuse:** The conduct of the Defendants and each of them, constitutes "physical abuse" as defined in the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15610.63(d)) by continually depriving MS. JACKSON with adequate nutrition and hydration for a prolonged period, as described herein, which caused her injury.

50. **Neglect:** The conduct of defendants, and each of them, constitutes neglect as that term is defined in Welfare and Institutions Code section 15610.57 to include "the negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise" including but not limited to:

(1) Failure to assist in personal hygiene, or in the provision of food, clothing, or shelter.

(2) Failure to provide medical care for physical and mental health needs.

(3) Failure to prevent malnutrition or dehydration.

**COMPLAINT FOR DAMAGES**

51. **Neglect of :** Without limiting the generality of the foregoing paragraph, Defendant committed elder neglect by:

a. **Failing to assist in personal hygiene, or in the provision of food, clothing, or shelter.** Defendants failed to implement a comprehensive care plan to ensure MS. JACKSON received adequate food, fluids, and supplements to prevent malnutrition and dehydration and promote wound healing including assessing for signs and symptoms of malnutrition; monitoring her intake and output; and implementing interventions to improve nutritional status. They failed to accurately document her functional limitations and need for assistance – for example, they repeatedly documented that she had no difficulty swallowing, despite the fact that she had been diagnosed with dysphagia and required a pureed diet, and they repeatedly documented that she did not require any assistance with eating even though she required 1:1 feeding assistance. As a result of these failures, MS. JACKSON did not receive the fluids and nutrients that she needed, and her condition declined. Defendants failed to implement a comprehensive care plan to promote and maintain good personal hygiene including keeping the patient clean, and free of urine and feces. At one point, she was discovered to have black bugs in her hair and on her body.

b. **Failure to provide medical care for physical and mental health needs.** Defendants failed to provide adequate wound care and treatment including dietary assessments, and food, fluid, and supplements to make sure the metabolic demands of healing a pressure wound are met; ongoing assessment and reassessment by a registered nurse to evaluate whether the wound healing protocol is effective and/or whether the wound is getting better, worse, or staying the same; and helping to arrange for needed medical equipment. Failing to provide medical care for MS. JACKSON's physical and mental health needs as described above caused her injuries and suffering.

c. **Failure to prevent malnutrition or dehydration.** Defendants failed to implement a comprehensive care plan to ensure MS. JACKSON received adequate food, fluids, and

17

supplements to prevent malnutrition and dehydration and promote wound healing including assessing for signs and symptoms of malnutrition; monitoring her intake and output; and implementing interventions to improve nutritional status. They failed to track her intake and output as required by her care plans. They failed to accurately document her functional limitations and need for assistance – for example, they repeatedly documented that she had no difficulty swallowing, despite the fact that she had been diagnosed with dysphagia and required a pureed diet, and they repeatedly documented that she did not require any assistance with eating even though she required 1:1 feeding assistance. As a result of these failures, MS. JACKSON was hospitalized twice for dehydration - first by Marin Hospital on May 4-6 2021, and then by Kaiser Hospital May 5-14, on which occasion her dehydration was documented as being "severe."

52. **Neglect by :** As alleged above, SAN RAFAEL OPERATING COMPANY is a mere shell of MARINER HEALTH CENTRAL and is the managing agent of MARINER HEALTH CENTRAL. SAN RAFAEL OPERATING COMPANY is a wholly owned subsidiary and MARINER HEALTH CENTRAL directs SAN RAFAEL OPERATING COMPANY's day-to-day operations. By virtue of this agency relationship, MARINER HEALTH CENTRAL also neglected MS. JACKSON in the ways identified in Paragraph 51 (a)-(c).

53. In addition, and without limiting the generality of the foregoing, the , as owners and operators of SAN RAFAEL OPERATING COMPANY neglected MS. JACKSON when they failed: to implement policies and procedures to ensure resident care needs are met; to provide training on the policies and procedures to ensure resident care needs are met; to ensure physicians care was provided; to plan a budget whereby staffing levels were adequate; to allocate sufficient resources to the FACILITY; to staff the FACILITY in both quantity and quality caregivers; and to comply with state and federal laws and regulations pertaining to SNFs.

///

///

18

54. **Evidence of Recklessness and Conscious Disregard for the Safety and Well-Being of MS. JACKSON by THE LICENSEE and MARINER HEALTH CENTRAL, INC.:**

Pursuant to California law, Defendant was required to provide an elder adult, such as MS. JACKSON, with "basic services". Defendant had a duty to continually assess MS. JACKSON's condition, a duty to note changes in MS. JACKSON's condition, and a duty to immediately notify MS. JACKSON's physician and family of changes. Defendant similarly had a duty to create and update adequate plans of care, to assess and reassess to update those care plans, and to monitor and supervise to determine whether the care plan was working. Defendant had a duty to assist MS. JACKSON with hygiene, feeding, bathing, dressing, and toileting, to treat her with dignity and respect, and to provide adequate numbers of nursing and other similar staff to assist her. Defendant had a duty to employ adequately trained staff. Yet Defendant failed to provide medical care and custodial care sufficient to meet MS. JACKSON's physical and mental health needs and failed to protect her from health and safety hazards, as described in detail herein.

55. Defendant knew that MS. JACKSON required assistance to meet her basic needs, yet failed to provide for those needs, even with knowledge of MS. JACKSON's high risk for injury, her dependence on staff, and the substantial certainty that MS. JACKSON would be injured if these needs were not provided for. Defendant's failure to provide MS. JACKSON with the care, assistance, and monitoring that she required caused her harm and ultimately death.

56. **Withholding of Care:** Defendant denied and withheld basic care to decedent MS. JACKSON despite the knowledge that by doing so, injury was substantially certain to befall her or with conscious disregard of the high probability of such injury. Defendant's denial and withholding of basic care to MS. JACKSON caused her injuries, needless suffering, emotional distress, and death. Specifically, their failure to track her intake and output and failure to provide adequate assistance with eating caused her to decline, becoming severely dehydrated and developing a Stage IV pressure ulcer.

57. In *Sababin v. Sup. Ct. (Covina Rehabilitation Center)* (2006) 144 Cal.App.4th 81

**COMPLAINT FOR DAMAGES**

establishes that a total absence of care is not required for a care facility to be held liable for Elder

Abuse and Neglect: "If some care is provided, that will not necessarily absolve a care facility of

dependent abuse liability. For example, if a care facility knows it must provide a certain type of

care on a daily basis but provides that care sporadically, or is supposed to provide multiple types

of care but only provides some of those types of care, withholding of care has occurred. In those

cases, the trier of fact must determine whether there is a significant pattern of withholding

portions or types of care. A significant pattern is one that involves repeated withholding of care

and leads to the conclusion that the pattern was the result of choice or deliberate indifference." [1]

Thus, there was repeated withholding of care each time Defendants, and each of them, interacted

with MS. JACKSON and failed to implement her care plans, day after day, shift after shift, from

April 2, 2021 to August 10, 2021.  These daily failures constitute withholding of care.

58. **Direct Neglect by the MARINER DEFENDANTS based on the Corporate Choice to
Minimize Staff and Maximize Profits**: One of the reasons  failed to meet MS. JACKSON's

need for care and basic services, to avoid needless suffering, injury, and emotional distress, and

death, is that the MARINER DEFENDANTS made a conscious choice to understaff the nursing

home, in both quantity and quality of nursing personnel.  The decision to understaff was made at

the corporate level by the MARINER DEFENDANTS and  in order to increase the profitability

of the nursing home, in conscious disregard of patient care needs.  The MARINER

DEFENDANTS, along with their directors, officers and managing agents (including the

FACILITY's Administrator and Director of Nursing), conceived of and implemented a plan to

increase business profits at the expense of residents like MS. JACKSON, and other FACILITY

residents.  Integral to this plan was the practice and pattern of the MARINER DEFENDANTS

staffing its facilities with an insufficient number of care personnel, many of whom were not

properly trained nor qualified to care for the elders whose lives were entrusted to them.  This

included using LVNs to do nursing assessments outside the scope of their licensure knowing the

---

[1] *Sababin v. Superior Court* (2006) 144 Cal.App,4th 81, 90.

**COMPLAINT FOR DAMAGES**

right quantity and quality of staff is required by law and there is a direct relationship between the quantity and quality of staff to patient outcomes.  The understaffing and lack of training was designed to reduce labor costs and to increase profits, and resulted in high staff turnover and the physical abuse and neglect of many residents of the facilities and most specifically, MS. JACKSON.  This corporate policy to not maintain sufficient staffing as required by law was developed and implemented with the conscious disregard for the likelihood of physical harm and injury to those who it is in the business to protect, including MS. JACKSON, who did in fact suffer as a direct consequence of the MARINER DEFENDANTS' proprietary interests, which it placed above that of her and other residents.

59. The MARINER DEFENDANTS had a duty to employ adequate numbers of sufficiently staffed employees to provide minimum services and oversight of residents, policies and procedures to ensure that basic services and oversight are implemented to assure the health and safety of residents, employment and training of staff such that staff is experienced and competent to perform the job duties necessary to assure safety and oversight of residents, accepting, training and employing staff in a manner that avoids "a revolving door" of crucial managerial employees such that there is little or no continuity and/or an absence of crucial managerial employees at critical times such as the initial admission of a resident to the facility.

60. **Understaffing causes poor patient outcomes**: SAN RAFAEL OPERATING COMPANY and  knew that by understaffing their facility, in quantity and quality, they were putting patients (including MS. JACKSON) at risk for known, harmful, life threatening conditions, including bedsores and infection.  This is because everyone involved in nursing home operations including the owners, operators, administrators, and directors of nursing understand the direct relationship between staffing and patient outcomes.  The higher the staffing ratio, the better the patient outcome.

\\\

\\\

**COMPLAINT FOR DAMAGES**

61. **Fraud in the Commission of Elder Abuse and Neglect/Knowing concealment of profit motives by SAN RAFAEL OPERATING COMPANY:** Defendant knew or should have known that their operation was designed and operated in a manner to circumvent its legal duty to comply with applicable statutes and regulations so as to maximize profitability. That knowledge was exclusively in the possession of the Defendant. Neither MS. JACKSON nor her family had any such knowledge, nor the opportunity to obtain such knowledge and information. MS. JACKSON and her family believed that Defendant's business operations were, as represented by the Defendant, properly run in compliance with the law and that the care afforded to its residents was within all State guidelines. In particular, they understood that the management and staff at the FACILITY were "experts" and were readily familiar, capable, able and committed to the care and oversight of residents such as MS. JACKSON. Such representations were fraudulent. Further, Defendant's conduct was reckless and in conscious disregard of MS. JACKSON's rights and safety.

62. SAN RAFAEL OPERATING COMPANY convinced MS. JACKSON and her family that they were sufficiently staffed and equipped to provide for MS. JACKSON's needs, and that she was receiving care that was appropriate for her condition. They represented to MS. JACKSON's family that they were doing everything in their power to improve her condition, and that her suffering and decline were unpreventable. SAN RAFAEL OPERATING COMPANY knew those promises and assurances were untrue. SAN RAFAEL OPERATING COMPANY knew the FACILITY was not properly staffed, and was not providing proper care in accordance with her care plan. The purpose of their promises and assurances was to induce MS. JACKSON's family to keep her at the FACILITY purely for financial gain. Their statements were false and were part of the MARINER DEFENDANTS' business model of making fraudulent representations to dependent persons like MS. JACKSON. Furthermore, they failed to report the development of MS. JACKSON's pressure sores to her family and physician, and fraudulently concealed the severity of her wounds from her family and physician. They did so

22

1  because they did not want MS. JACKSON's family to remove her from the FACILITY; rather,

2  they wanted to keep her as a resident for the purpose of their own profit.

3      63. **Ratification/authorization of SAN RAFAEL OPERATING COMPANY, and**

4  **Corporate directives and reporting**: This continual pattern of withholding care and

5  understaffing at  was well known to the MARINER DEFENDANTS,  and their officers,

6  directors and managing agents (including the FACILITY's Administrator and Director of

7  Nursing). Upon information and belief, the FACILITY's Administrator and Director of Nursing

8  routinely reported up the chain of command to corporate managing agents about what was

9  happening on the floor at the nursing home.  The FACILITY's Administrator and Director of

10  Nursing also routinely reported admission, discharge and staffing data, and the MARINER

11  DEFENDANTS directed and controlled the staffing budget by allocating resources, setting

12  staffing minimums and maximums, and directing staff to patient ratios.  By law, the MARINER

13  DEFENDANTS was responsible for setting policies and procedures to be implemented in the

14  FACILITY and provide supervision and oversight of administration and nursing services by and

15  through managers and directors.

16      64. These corporate managing agents had a duty to direct the nurses and staff yet did not

17  make any changes at the FACILITY, even with the knowledge of substandard care, failures to

18  assess, monitor and respond to changes in resident condition, inadequate custodial care,

19  inadequate hygiene, and inadequate safety measures at the FACILITY. The managing agents of

20  each Defendant knew or should have known of the lack of proper custodial care to its patients, as

21  well as its understaffing, poor training, and the failure to implement care plans based on internal

22  reporting and also the oversight, monitoring and reporting of the Department of Public Health.

23  Any and all findings of the Department of Public Health regarding care failures at the

24  FACILITY were reported up the corporate chain.  Despite THE MARINER DEFENDANTS'

25  conscious knowledge of these conditions, the managing agents did not take appropriate and

26

27

28

23

1   adequate steps to prevent and correct them, and they did not inform MS. JACKSON's family of

2   what they knew about these dangerous conditions.

3       65. The MARINER DEFENDANTS and their officers, directors and managing agents

4   (including the FACILITY's Administrator and Director of Nursing) knew that their business was

5   operating in a manner so as to maximize profitability by circumventing the legal duty to assure

6   the health, safety and oversight of residents such as MS. JACKSON and, in particular, the duty

7   to hire competent employees, to train those employees and to terminate or discipline employees

8   for misconduct towards the residents, including MS. JACKSON.   As a result, SAN THE

9   MARINER DEFENDANTS and their officers, directors and managing agents (including the

10   FACILITY's Administrator and Director of Nursing) had knowledge of, ratified and/or

11   otherwise authorized all of the acts or omissions, which caused the injuries to MS. JACKSON.

12       66. **The MARINER DEFENDANTS Knowingly Employed Unfit Employees and**

13   **Authorized/Ratified the Misuse of LVNs**:  LVNs are per se "unfit" to perform the functions of

14   an RN, just as an RN is per se "unfit" to perform the functions of a medical doctor.  Here, the

15   MARINER DEFENDANTS authorized and ratified the use of LVNs to perform assessments that

16   they were not licensed or qualified to perform. In addition, the MARINER DEFENDANTS

17   knowingly hired unfit employees who were either incapable, unwilling, or unable to provide the

18   care and treatment MS. JACKSON needed because day-after-day, shift-after-shift, dozens of

19   staff watched her decline and withheld needed medical care.

20       67. As a direct and proximate result of the neglect, abuse, and misconduct by Defendant as

21   alleged herein, MS. JACKSON died on August 22, 2021.

22       68. As a direct and proximate result of the neglect, abuse, and misconduct by Defendant as

23   alleged herein, MS. JACKSON was caused to incur medical expenses and other related

24   expenses, all to her special damage in a sum to be established.

25

26

27

28

**COMPLAINT FOR DAMAGES**

69. As a direct and proximate result of the neglect, abuse, and misconduct by Defendant as alleged herein, MS. JACKSON suffered fear, anxiety, humiliation, physical pain and discomfort, and emotional distress, all to her general damage in a sum to be established.

70. By the neglect, abuse, and misconduct by Defendant as alleged herein, they are guilty of recklessness, fraud, oppression, and/or malice.  The specific facts set forth above show a disregard of the high probability that MS. JACKSON would be injured and die.  In addition to special damages, Plaintiff is therefore entitled to an award of the reasonable attorney's fees and costs incurred in prosecuting this case as well as MS. JACKSON's pre-death pain and suffering and punitive damages pursuant to Welfare & Institutions Code section 15657 and Civil Code section 3294.

## SECOND CAUSE OF ACTION

**(Violation of Resident Rights by plaintiff TRACY JACKSON, by and through her Successor in Interest, AVIS DEWALT, as against Defendant SAN RAFAEL OPERATING COMPANY dba PINE RIDGE CARE CENTER)**

71. Plaintiff incorporates herein by reference paragraphs 1 through 70 of this Complaint as though fully set forth.

72. The acts and omissions of Defendant alleged above constitute violations of patients' rights within the meaning of Health and Safety Code section 1430(b).  This statute allows a current or former resident to pursue damages and an injunction for violations of patients' rights set forth in Title 22 of the California Code of Regulations section 72527 and other state and federal laws and regulations.

73. A plaintiff may recover up to $500 per violation prosecuted under Health & Safety Code section 1430(b).  Here, Defendant's conduct as described in the foregoing sections violated several of Ms. Jackson's statutory rights, including but not limited to:

        a.   Right to be treated with consideration, respect, and full recognition of dignity (Cal. Code Regs., tit. 22, § 72527(a)(12));

b. Right to receive care in such a manner and in such an environment by facility staff to be free from mental and physical abuse and neglect (Cal. Code Regs., tit. 22, § 72527(a)(10); 42 C.F.R. § 483.12);

c. Right to have individualized care needs identified based on assessment of patient's needs with input from patient and, if necessary, health professionals involved in the care of the patient (Cal. Code Regs., tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 483.10(f), 483.20(b)(1); 42 U.S.C. § 1395i-3(b)(3));

d. Right to receive care as implemented by individualized written patient care plan indicating the care to be given, objectives to be accomplished, and the professional discipline responsible for each element of care (Cal. Code Regs., tit. 22, § 72311(a)(1)(B), 72311(a)(2); 42 C.F.R. § 483.10(c)); 42 U.S.C. § 1395i-3(b)(4));

e. Right to have patient care plans reviewed, evaluated, and updated as necessary and more often if there is a change of the patient's condition (Cal. Code Regs., tit. 22, § 72311(a)(1)(C));

f. Right for the resident or responsible party to have the opportunity to participate in an immediate and ongoing basis in the total plan of care including identification of medical, nursing, and psychosocial needs and the planning of related services (Cal. Code Regs., tit. 22, § 72527(a)(3); 42 C.F.R. § 483.10(c));

g. Right to have a record of nurses' notes that are clear and legible, dated and signed, among other qualifications, including narratives or how a patient responds, eats, drinks, looks, feels, and reacts (Cal. Code Regs., tit. 22, § 72547(a)(5));

h. Right to have family and physician notified of any change of condition and to have all attempts to notify physician noted in patient's health record (Cal. Code Regs., tit. 22, § 72311(a)(3) and (b));

**COMPLAINT FOR DAMAGES**

i.   Right to receive care in such a manner and in such an environment to prevent formation and progression of pressure ulcers including turning and repositioning; using pressure-reducing devices where indicated; provide care to maintain clean, dry skin free of feces and urine; and carry out physician orders for treatment of ulcers (Cal. Code Regs., tit. 22, § 72315(f); Health & Saf. Code, § 1599.1(b));

j.   Right to receive adequate personal hygiene, nutrition, and fluids to prevent malnutrition, dehydration, and promote wound healing (Cal. Code of Regs., tit. 22, §§ 72315(d)(g)(h); Health & Saf. Code, § 1599.1(b));

k.   Right to receive adequate care and treatment to prevent the development and progression of infections (Cal. Code Regs., tit. 22, § 72321(b));

l.   Right to receive pharmaceutical and physical therapy services for effective pain management (Cal. Code Regs., tit. 22, §§ 72355, 72403(b)(3));

m.   Right to receive adequate number of qualified personnel to carry out all functions of the facility and to meet patients' needs as well as adequate training and competent supervision (Cal. Code of Regs., tit. 22, §§ 72329 and 72329.1; Health & Saf. Code, § 1599.1(a); 42 C.F.R. §§ 483.35, 483.95).

74. Defendant violated the above-referenced patient rights when defendant failed to provide appropriate services to prevent serious injury to plaintiff.

75. MS. JACKSON is entitled to an award of statutory damages as set forth in Health and Safety Code section 1430(b) for up to $500 for each right violated as alleged herein.  Plaintiff reserves the right to amend the pleadings to add additional rights violated as the case progresses.

76. Plaintiff is entitled to attorney's fees and costs and an injunction to prevent further violations, in addition to other remedies set forth in Health and Safety Code section 1430(b). The [Proposed] Stipulation for an Injunction is attached hereto as Exhibit A.

\\\

\\\

27

**COMPLAINT FOR DAMAGES**

### THIRD CAUSE OF ACTION

**(Negligence by TRACY JACKSON, by and through her Successor in Interest, AVIS DEWALT, as against all Defendants)**

77. Plaintiff incorporates herein by reference paragraphs 1 through 76 of this Complaint as though fully set forth.

78. Defendants, and each of them, owed a duty of care to MS. JACKSON to act reasonably in the discharge of their duties including but not limited to hire, retain, and train sufficient staff to provide her with necessary care and services based on assessment and recognition of her individualized care needs; a duty to protect her from health and safety hazards including wound prevention, treatment, and care; a duty to observe and report changes of condition to family and physicians; and a duty to ensure she does not suffer needlessly.

79. Defendants, and each of them, breached their duties as described herein.

80. As a direct and proximate result of the wrongful conduct as alleged by plaintiffs, and the breaches of duty owed to plaintiff, MS. JACKSON suffered harm and injury, including but not limited to pain, infection, attendant decline in function and physical and mental deterioration, isolation, fear, anxiety, humiliation, physical pain and discomfort, and emotional distress, all to her general damage in a sum to be established.

81. As a direct and proximate result of the wrongful conduct as alleged by plaintiff, MS. JACKSON was caused to incur the expense of acute hospitalization, medical, and other related expenses, the full nature, extent, and amount of which are not yet known to plaintiff.

### FOURTH CAUSE OF ACTION

**(Wrongful Death by DAVONTE BARFIELD, as against all Defendants)**

82. Plaintiff incorporates herein by reference paragraphs 1 through 81 of this Complaint as though fully set forth.

83. As a proximate result of the negligent conduct by defendants, and breaches of the duty owed to plaintiffs and decedent, and breaches of the standard of care owed, as alleged above, MS. JACKSON died on August 22, 2021.

84. As a proximate result of the negligent conduct by defendants, and breaches of the duty owed to plaintiffs and decedent, and breaches of the standard of care owed, as alleged above, MS. JACKSON died on August 22, 2021.

85. Pleading in the alternative, as a proximate result of the wrongful and abusive conduct of defendants, including but not limited to the allegations of neglect and abuse, and acts or omissions undertaken with recklessness, malice, oppression and/or fraud, MS. JACKSON died on August 22, 2021.

86. As a result, DAVONTE BARFIELD has been deprived of his relationship with his mother, MS. JACKSON, including her love, solace, affection, comfort and companionship. In addition, Plaintiffs incurred funeral and burial expenses in a sum according to proof at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

On the First Cause of Action: Elder Abuse and Neglect (Welfare & Institutions Code § 15600, et seq.) against all Defendants

1. For general damages in an amount in excess of the minimum jurisdiction of this court;

2. For special damages including past hospital, medical, professional and incidental expenses, according to proof;

3.  For attorney's fees and costs pursuant to Welfare & Institutions Code § 15657 and according to proof;

4. For exemplary damages pursuant to Welfare & Institutions Code § 15657 and Civil Code § 3294;

On the Second Cause of Action: Violation of Resident Rights – Health & Safety Code § 1430(b)

**COMPLAINT FOR DAMAGES**

1. For an injunction enjoining future violations of the rights enumerated herein, as set forth on the attached proposed injunction, Exhibit A;

2. For statutory damages according to proof pursuant to Health & Safety Code section 1430(b);

3. For attorney's fees and costs pursuant to Health & Safety Code section 1430(b);

On the Third Cause of Action: Negligence

1. For general damages in an amount in excess of the minimum jurisdiction of this court;

2. For special damages including past hospital, medical, professional and incidental expenses, according to proof;

On the Fourth Cause of Action: Wrongful Death

3. For general damages in an amount in excess of the minimum jurisdiction of this court;

4. For special damages including burial and funeral expenses, and past hospital, medical, professional and incidental expenses, according to proof;

On all counts

1. For costs of suit; and

2. Whatever further relief the court may find just and proper.


Dated: March 11, 2022                                JOHNSON MOORE

                                                      By: _____
                                                          Greg Johnson
                                                          Joanna Hutchins
                                                          Attorneys for Plaintiff

**COMPLAINT FOR DAMAGES**