# EXHIBIT G

1  Edward P. Dudensing (Bar No. 182221)
   Jay P. Renneisen (Bar No. 173531)
2  Thomas A. Reyda (Bar No. 312632)
   *Dudensing Law*
3  1610 R Street, Suite 220
   Sacramento, CA 95811
4  Telephone:  (916) 448-6400
   Facsimile:    (916) 448-6401
5

6  Attorneys for Plaintiffs

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**06/16/2022 at 09:12:17 PM**
By: Angela Linhares,
Deputy Clerk

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                      FOR THE COUNTY OF ALAMEDA

9

10  ALYSSA DOE and JEFF DOE,                     )    Case No.  **22CV012984**
                                                 )
11                Plaintiffs,                     )    **COMPLAINT FOR DAMAGES**
                                                 )
12        vs.                                     )    1.  **Dependent Adult Neglect**
                                                 )    2.  **Dependent Adult Neglect**
13  SAN RAFAEL OPERATING COMPANY )                         **(Enhanced Remedies Sought)**
    LP dba PINE RIDGE CARE CENTER; )              3.  **Negligence (Custodial)**
14  NATIONAL SENIOR CARE, INC.;     )             4.  **Violation of Patients' Bill Of**
    MARINER HEALTH CARE, INC.;      )                 **Rights**
15  MARINER HEALTH CENTRAL, INC.; )              5.  **NIED**
    MARINER HEALTH CARE             )
16  MANAGEMENT COMPANY; MHC         )
    HOLDING COMPANY; MHC WEST       )
17  HOLDING COMPANY; GRANCARE,      )
    LLC; SAN RAFAEL OPERATING       )
18  COMPANY GP LLC; LINDA TAETZ;    )
19  DENNIS SARCAUGA; ROWENA         )
    BEDUYA; THOMAS DURR; ANTON      )
20  GENABE; and DOES 1 through 50,  )
    inclusive,                      )
21                                  )
22                Defendants.       )
                                    )
23  _____)

24

25

1    Plaintiffs allege as follows:

2    **PARTIES**

3    1.    Plaintiff Alyssa Doe ("Alyssa") at all times alleged herein was and is a

4    dependent adult within the meaning of Welfare and Institutions Code section 15600, *et seq.*

5    Alyssa is both mentally and physically disabled.  In 2016 she suffered a traumatic brain

6    injury ("TBI") and other serious injuries in a high speed motor vehicle collision.

7

8    Thereafter, she was admitted as a resident of defendants' skilled nursing facility where,

9    among other things, she was sexually assaulted and raped due to defendants' conduct as

10    alleged herein.  Given the nature of the assaults upon her, Alyssa's identity is being

11    protected in this public court filing by not disclosing her last name.  Alyssa suffered untold

12    pain, suffering, and serious injury as a result of all named defendants' reckless neglect and

13    abuse.

14

15    2.    Plaintiff Jeff Doe ("Jeff") is the father of Alyssa.  At all times material hereto

16    he was and is a resident of Kern County, California.  To protect Alyssa's identity, her

17    father's last name is also not being disclosed in this public court filing.

18    3.    At all times mentioned herein, defendant San Rafael Operating Company LP

19    dba Pine Ridge Care Center (hereafter "Pine Ridge") was and is in the business of providing

20    long-term care as a skilled nursing facility as defined in section 1250(c) of the Health and

21    Safety Code and was subject to the requirements of federal and state law.  Pine Ridge is a

22    limited partnership qualified to do business in, and subject to the jurisdiction of the

23    Superior Court of California.  At all times relevant to this action, Pine Ridge did business at

24

25    45 Professional Center Parkway, San Rafael, CA 94903.

1

2    4.    At all times mentioned herein defendant National Senior Care, Inc. was and

3    is a corporation that owned, managed, controlled, maintained, and operated Pine Ridge.

4    National Senior Care, Inc. is a Delaware corporation qualified to do business in, and subject

5    to the jurisdiction of the Superior Court of California.  At all times relevant to this action,

6    National Senior Care, Inc. identified its main business address as 920 Ridgebrook Road,

7    Sparks, Maryland  21152.

8        5.    At all times mentioned herein defendant Mariner Health Care, Inc. was and is

9    a corporation that owned, managed, controlled, maintained, and operated Pine Ridge.

10   Mariner Health Care, Inc. is a Delaware corporation qualified to do business in, and subject

11   to the jurisdiction of the Superior Court of California.  At all times relevant to this action,

12   Mariner Health Care, Inc. identified its main business address as 920 Ridgebrook Road,

13   Sparks, Maryland  21152.

14

15       6.    At all times mentioned herein defendant Mariner Health Central, Inc. was

16   and is a corporation that owned, managed, controlled, maintained, and operated Pine Ridge.

17   Mariner Health Central, Inc. is a Delaware corporation qualified to do business in, and

18   subject to the jurisdiction of the Superior Court of California.  At all times relevant to this

19   action, Mariner Health Central, Inc. identified its main business address as 920 Ridgebrook

20   Road, Sparks, Maryland  21152.

21

22       7.    At all times mentioned herein defendant Mariner Health Care Management

23   Company was and is a corporation that owned, managed, controlled, maintained, and

24   operated Pine Ridge.  Mariner Health Care Management Company is a Delaware

25   corporation qualified to do business in, and subject to the jurisdiction of the Superior Court

of California. At all times relevant to this action, Mariner Health Care Management Company identified its main business address as 920 Ridgebrook Road, Sparks, Maryland 21152.

8.    At all times mentioned herein defendant MHC Holding Company was and is a corporation that owned, managed, controlled, maintained, and operated Pine Ridge. MHC Holding Company is a Delaware corporation qualified to do business in, and subject to the jurisdiction of the Superior Court of California. At all times relevant to this action, MHC Holding Company identified its main business address as 920 Ridgebrook Road, Sparks, Maryland 21152.

9.    At all times mentioned herein defendant MHC West Holding Company was and is a corporation that owned, managed, controlled, maintained, and operated Pine Ridge. MHC West Holding Company is a Delaware corporation qualified to do business in, and subject to the jurisdiction of the Superior Court of California. At all times relevant to this action, MHC West Holding Company identified its main business address as 920 Ridgebrook Road, Sparks, Maryland 21152.

10.    At all times mentioned herein defendant GranCare, LLC was and is a limited liability company that owned, managed, controlled, maintained, and operated Pine Ridge. GranCare, LLC is a Delaware limited liability company qualified to do business in, and subject to the jurisdiction of the Superior Court of California. At all times relevant to this action, GranCare, LLC identified its main business address as 920 Ridgebrook Road, Sparks, Maryland 21152.

11.    At all times mentioned herein defendant San Rafael Operating Company GP LLC was and is a limited liability company that owned, managed, controlled, maintained, and operated Pine Ridge. San Rafael Operating Company GP LLC is a Delaware limited liability company qualified to do business in, and subject to the jurisdiction of the Superior Court of California. At all times relevant to this action, San Rafael Operating Company GP LLC identified its main business address as 920 Ridgebrook Road, Sparks, Maryland 21152.

12.    At relevant times herein, defendant Linda Taetz was a Senior Vice President of the corporate, LLC and LP entity defendants identified in this complaint. At all times herein, this defendant had direct oversight over and responsibility for the operations of Pine Creek and all of the skilled nursing facilities in the Mariner chain. This defendant knew and should have known about the resident care and resident safety compromises at Pine Creek and other Mariner facilities as alleged herein, including but not limited to systemic failures to ensure the facilities were sufficiently staffed to meet to custodial care needs of the residents, as well as systemic failures to ensure vulnerable residents, including but not limited to Alyssa, were safe from sexual predators and sexual assaults. On information and belief, plaintiffs allege that at all material times hereto, this defendant was and is a resident of Ventura County.

13.    At relevant times herein, defendant Dennis Sarcauga was an Executive Vice President of the corporate, LLC and LP entity defendants identified in this complaint. This defendant knew and should have known about the resident care and resident safety compromises at Pine Creek and other Mariner facilities as alleged herein, including but not limited to systemic failures to ensure the facilities were sufficiently staffed to meet to

1 custodial care needs of the residents, as well as systemic failures to ensure vulnerable

2 residents, including but not limited to Alyssa, were safe from sexual predators and sexual

3 assaults.   On information and belief, plaintiffs allege that at all material times hereto, this

4 defendant was and is a resident of Los Angeles County.

5

6       14.    At relevant times herein, defendant Rowena Beduya was a Vice President of

7 Clinical Operations for the corporate, LLC and LP entity defendants identified in this

8 complaint.  This defendant knew and should have known about the resident care and

9 resident safety compromises at Pine Creek and other Mariner facilities as alleged herein,

10 including but not limited to systemic failures to ensure the facilities were sufficiently staffed

11 to meet to custodial care needs of the residents, as well as systemic failures to ensure

12 vulnerable residents, including but not limited to Alyssa, were safe from sexual predators

13 and sexual assaults.  On information and belief, plaintiffs allege that at all material times

14 hereto, this defendant was and is a resident of Alameda County.

15

16       15.    At relevant times herein, defendant Thomas Durr was a Director of Patient

17 Advocacy for the corporate, LLC and LP entity defendants identified in this complaint.  At

18 all times herein, this defendant had direct oversight over and responsibility for the

19 operations of Pine Creek and all of the skilled nursing facilities in the Mariner chain.  This

20 defendant knew and should have known about the resident compromises at Pine Creek and

21 other Mariner facilities alleged herein, including not limited to systemic failures to ensure

22 the facilities were sufficiently staffed to meet to custodial care needs of the residents, and

23 with respect to systemic failures to ensure vulnerable residents, including but not limited to

24 Alyssa, were safe from sexual predators and sexual assaults. On information and belief,

25

1  plaintiffs allege that at all material times hereto, this defendant was and is a resident of

2  Alameda County.

3       16.     At relevant times herein, defendant Anton Genabe was a Regional Director

4  of Clinical Operations for the corporate, LLC and LP entity defendants identified in this

5  complaint. At all times herein, this defendant had direct oversight over and responsibility

6  for the operations of Pine Creek and all of the skilled nursing facilities in the Mariner chain.

7

8  This defendant knew and should have known about the resident care and resident safety

9  compromises at Pine Creek and other Mariner facilities as alleged herein, including but not

10 limited to systemic failures to ensure the facilities were sufficiently staffed to meet to

11 custodial care needs of the residents, as well as systemic failures to ensure vulnerable

12 residents, including but not limited to Alyssa, were safe from sexual predators and sexual

13 assaults. On information and belief, plaintiffs allege that at all material times hereto, this

14 defendant was and is a resident of Alameda County.

15

16      17.     Plaintiffs are ignorant of the true names and capacities of those defendants

17 named as Does 1 through 50 (hereafter "Doe Defendants"), and for that reason have sued

18 these defendants by fictitious names. Plaintiffs allege that each of the fictitiously named

19 Doe Defendants is in some way liable and legally responsible for the damages and injuries

20 set forth in this complaint. Plaintiffs will seek leave of the Court to amend this complaint

21 to identify these Doe Defendants when their identities are determined.

22

23      18.     In this complaint, plaintiffs refer to defendants San Rafael Operating

24 Company LP dba Pine Ridge Care Center; National Senior Care, Inc.; Mariner Health Care,

25 Inc.; Mariner Health Central, Inc.; Mariner Health Care Management Company; MHC

1   Holding Company; MHC West Holding Company; GranCare, LLC; San Rafael Operating

2   Company GP LLC; Linda Taetz; Dennis Sarcauga; Rowena Beduya; Thomas Durr; Anton

3   Genabe; and the Doe Defendants collectively as "Defendants." Whenever plaintiffs refer

4   to "defendants" they are referring to defendants San Rafael Operating Company LP dba

5   Pine Ridge Care Center; National Senior Care, Inc.; Mariner Health Care, Inc.; Mariner

6   Health Central, Inc.; Mariner Health Care Management Company; MHC Holding

7   Company; MHC West Holding Company; GranCare, LLC; San Rafael Operating Company

8   GP LLC; Linda Taetz; Dennis Sarcauga; Rowena Beduya; Thomas Durr; Anton Genabe;

9   and the Doe Defendants as if they had identified each of them individually.

10        19.    In this complaint, plaintiffs refer to defendants San Rafael Operating

11  Company LP dba Pine Ridge Care Center; National Senior Care, Inc.; Mariner Health Care,

12  Inc.; Mariner Health Central, Inc.; Mariner Health Care Management Company; MHC

13  Holding Company; MHC West Holding Company; GranCare, LLC; San Rafael Operating

14  Company GP LLC and the Doe Defendants 1-30 collectively as the "Mariner Corporate

15  Defendants." Whenever plaintiffs refer to the "Mariner Corporate Defendants" they are

16  referring to San Rafael Operating Company LP dba Pine Ridge Care Center; National

17  Senior Care, Inc.; Mariner Health Care, Inc.; Mariner Health Central, Inc.; Mariner Health

18  Care Management Company; MHC Holding Company; MHC West Holding Company;

19  GranCare, LLC; San Rafael Operating Company GP LLC and the Doe Defendants 1-25 as

20

21

22

23

24

25

if they had identified each of them individually. All of the Mariner Corporate Defendants

are part of a large chain of skilled nursing facilities known to the public as "Mariner."[1]

20.     In this complaint, plaintiffs refer defendants Linda Taetz, Dennis Sarcauga, Rowena Beduya, Thomas Durr, Anton Genabe and the Doe Defendants 31-50 collectively as the "Individual Defendants." Whenever plaintiffs refer to the "Individual Defendants" they are referring to Linda Taetz, Dennis Sarcauga, Rowena Beduya, Thomas Durr, Anton Genabe and the Doe Defendants 31-50 as if they had identified each of them individually.

21.     At all times mentioned herein, the Mariner Corporate Defendants owned, operated, and controlled Pine Ridge and the other facilities within the Mariner chain of skilled nursing facilities. The Mariner Corporate Defendants controlled all critical aspects of the operation of Pine Ridge to such a degree that they are directly liable for the wrongdoing that Pine Ridge perpetrated upon Alyssa. Specifically, as further set forth below, the Mariner Corporate Defendants controlled staffing decisions at Pine Ridge; received and controlled all revenues generated by Pine Ridge; knowingly and deliberately understaffed and underfunded Pine Ridge despite knowing it posed a serious danger to its residents; and, more generally, created the overall plan to maximize profits at the expense of patient care. Part and parcel of the Mariner Corporate Defendants' plan was to cut staffing at their facilities, including Pine Ridge, despite knowing full well that they did not have enough staff in terms of numbers, qualifications, and supervision to take care of and protect the residents in their facilities, including Pine Ridge.

---

[1] *See* https://www.marinerhealthcare.com/ (last accessed 6/16/22).

22.    Numerous red flags put the Mariner Corporate Defendants on notice of serious problems at their facilities, including Pine Ridge.  Mariner facilities have been the target of multiple civil lawsuits as well as state regulatory actions arising from resident injuries, resident sexual assaults (both by staff and other residents), and resident deaths resulting from their deliberate and habitual understaffing of facilities and abject failures to ensure resident safety.  The Mariner Corporate Defendants were aware of numerous complaints that the level of staffing at Mariner facilities was inadequate, and that staff were so overburdened that they could not comply with state or federal mandates, or the standard of care.  The Mariner Corporate Defendants knew that their facilities, including Pine Ridge, were troubled (inadequate staff, insufficient training, DPH visits, fines, civil lawsuits, staff turnover, etc.), but the Mariner Corporate Defendants kept admitting new residents without increasing staffing, and hid the problems from prospective families, including Alyssa's family.  Despite this knowledge, the Mariner Corporate Defendants continued their profit-maximizing strategy, and jeopardized resident health and safety because profits were prioritized above resident well-being.

23.    In addition to the foregoing direct liability of the Mariner Corporate Defendants, plaintiffs maintain that the Mariner Corporate Defendants are liable for the wrongdoing of Pine Ridge because Pine Ridge is an alter ego of the Mariner Corporate Defendants.  In that connection, the Mariner Corporate Defendants ostensibly operate as a service organization that performs all services for individual facilities, including Pine Ridge, but in reality, they directly control the facilities.  The Mariner Corporate Defendants own

1 | and have the ability to directly control all individual facilities in their chain, including Pine

2 | Ridge.

3 |     24.    The allegations supporting the Mariner Corporate Defendants' alter ego

4 | relationship with Pine Ridge include the following, among others. The officers, directors,

5 | managers, shareholders, and members of the board of directors of the Mariner Corporate

6 | Defendants and their various facilities, including Pine Ridge, are believed to be substantially

7 | identical. The Mariner Corporate Defendants perform all accounting functions for Pine

8 | Ridge and entirely control its finances. In addition, Pine Ridge has limited assets with all

9 | profits reaped from its operations flowing to its parent corporations, the Mariner Corporate

10 | Defendants. As alter egos, the Mariner Corporate Defendants and Pine Ridge operate as

11 | care custodians over the residents at Pine Ridge and are fully subject to liability based on the

12 | reckless neglect that Alyssa suffered at Pine Ridge. Pine Ridge has intentionally been

13 | undercapitalized as a way of avoiding liability for the wrongdoing of its employees. Pine

14 | Ridge's administrator directly reports to individuals from the Mariner Corporate

15 | Defendants, including the individually named defendant herein.

16 |     25.    Given the alter ego relationship between and among the Mariner Corporate

17 | Defendants and Pine Ridge, as a matter of law, each of the acts attributable to Pine Ridge is

18 | also legally attributable to the Mariner Corporate Defendants.

19 |     26.    In addition, the Mariner Corporate Defendants and Pine Ridge are engaged

20 | in a joint venture such that each of these entities is legally responsible for the wrongful

21 | conduct of the other. Specifically, the Mariner Corporate Defendants and Pine Ridge have

22 | combined their property, skill and knowledge with the intent of carrying out a single

business undertaking – to wit, the operation of a skilled nursing facility in a manner that maximizes profit at the expense of patient care. The entities have overlapping ownership. Joint control over the businesses exists as detailed in the foregoing paragraphs. The profits and losses of the businesses are shared and commingled. Given the joint control and operation of the Mariner Corporate Defendants and Pine Ridge, they constitute a joint venture such that the Mariner Corporate Defendants are legally liable for the fraudulent and otherwise wrongful conduct of Pine Ridge and vice versa.

27.    In addition, the Mariner Corporate Defendants are liable for the wrongdoing of Pine Ridge as to Alyssa because they acted as aiders and abettors of Pine Ridge's egregious plan to maximize profits at the expense of patient care. Specifically, the Mariner Corporate Defendants knew that their facility Pine Ridge was engaged in a plan to maximize profits at the expense of patient care by, among other things, drawing in high-acuity residents and then severely understaffing the facility. The Mariner Corporate Defendants knew that such a plan was substantially likely to result in significant harm to the facility's vulnerable patients including Alyssa. The Mariner Corporate Defendants gave substantial assistance to this egregious plan by, among other things, controlling the budget that led to the execution of the plan, giving financial incentives to facility personnel to carry out the plan, and otherwise creating a culture that encouraged and condoned this egregiously dangerous plan. Pine Ridge's conduct and the Mariner Corporate Defendants' conduct were substantial factors in causing harm to plaintiffs.

28.    In addition, the Mariner Corporate Defendants are liable for the wrongdoing of Pine Ridge as to Alyssa because the entities were co-conspirators in an egregious plan to

maximize profits at the expense of patient care. Specifically, the Mariner Corporate

Defendants knew that Pine Ridge was engaged in a plan to maximize profits at the expense

of patient care by, among other things, drawing in high acuity residents and then severely

understaffing the facility. The Mariner Corporate Defendants knew that such a plan was

substantially likely to result in significant harm to Pine Ridge's vulnerable patients, including

Alyssa. The Mariner Corporate Defendants agreed with the egregious plan described above

and intended that it be carried out. Indeed, the Mariner Corporate Defendants gave

substantial assistance to this egregious plan by, among other things, controlling the budget

that led to the execution of the plan, giving financial incentives to facility personnel to carry

out the plan, and otherwise creating a culture that encouraged and condoned this

egregiously dangerous plan. Pine Ridge's conduct and the Mariner Corporate Defendants'

conduct were substantial factors in causing harm to Alyssa.

## FACTUAL ALLEGATIONS

29.    All of the acts described herein constituted an ongoing practice and pattern

of neglect and abuse committed by the defendants.

30.    Alyssa was admitted to Pine Ridge on June 10, 2016 and was a resident until

to November 19, 2021.

31.    Alyssa was admitted to the facility for custodial care at the age of 26 after she

suffered a traumatic brain injury ("TBI") and other critical injuries in a motor vehicle

accident that occurred in 2016. Her vehicle, a pickup truck with a U-Haul trailer towed

behind, collided with a tree at high speed. Her injuries from the accident were traumatic

and extensive. In addition to the TBI, she suffered a traumatic cerebral infarction

1   (disrupted blood flow to the brain), respiratory failure requiring intubation, an anoxic coma,

2   left-sided hemiplegia (paralysis), traumatic cardiac arrest, blunt chest trauma, and six

3   fractured ribs, among other complications from the injury. She required multiple

4   emergency surgical interventions upon being transported to the acute hospital as a level 1

5   trauma patient and admitted to the ICU. Alyssa's family was informed she was a serious

6   risk for mortality, and if she survived, she had a very high likelihood of permanent severe

7   neurological disability and dependence. With best efforts at the acute hospital, Alyssa

8   survived but she suffered permanent brain damage and paralysis leaving her dependent on

9   others and wheelchair bound.

10

11          32.     Prior to the car accident and the resulting permanent brain injury, Alyssa also

12   had underlying diagnoses of schizophrenia (a serious mental illness that affects how a

13   person thinks, feels, and behaves), bipolar disorder and psychosis, which are still ongoing.

14          33.     During her residency at Pine Ridge, Allyssa was regularly prescribed and

15   administered a variety of powerful psychiatric medications, including Bupropion, Seroquel,

16   Lamictal and Valproic Acid. Her chart at Pine Ridge identifies various behaviors over time

17   that were the result of her severely compromised cognitive condition, including "sad facial

18   expression," behaviors of "hitting inanimate objects," "verbal outbursts," and "constant

19   refusals of care," among others. During her entire time at Pine Ridge, Alyssa also had a

20   diagnoses of cognitive communication defect and aphasia (loss of ability to understand or

21   express speech, caused by brain damage).

22          34.     During the entire time of her admission at Pine Ridge, Alyssa was severely

23   impaired mentally, cognitively and physically such that she was incapable of giving informed

24

25

1  consent to sexual conduct, and she lacked the ability to protect herself against improper

2  sexual advances, undue influence and other improper conduct by others.

3      35.      During the entire time of her admission at Pine Ridge, defendants knew that

4  Alyssa's father and responsible party, Jeff Doe, lived out of the area (300 miles away) and

5  was relying on them to keep Alyssa safe.

6

7      36.      Despite being aware of Alyssa's mental incapacity and impairments, the

8  facility staff and each of defendants and their agents and employees, were reckless and

9  negligent in the care and lack of care that was provided to Alyssa throughout her residency

10 at Pine Ridge.  This was an ongoing pattern over time starting in 2016 at the facility where

11 defendants failed to provide a sufficient number of properly trained and qualified staff to

12 monitor, protect and properly care for the residents, including Alyssa.  This pattern over

13 time also included but was not limited to failing to protect Alyssa from improper sexual

14 advances, undue influence and improper conduct by others even though the facility knew

15

16 she was vulnerable to inappropriate attention by men, and also knew that men at the facility

17 were making improper sexual advances upon here.  This pattern over time starting in 2016

18 also included ongoing failures by defendants to properly screen, supervise, monitor, and

19 train management and staff at the facility to prevent, avoid and intervene in incidents of

20 improper sexual advances and contact both upon Alyssa, as well as other residents.  This

21 pattern over time also included ongoing failures to properly assess, treat and monitor

22 Alyssa's mental and health status and psychosocial wellbeing as required given her cognitive

23

24 status, thus making her more vulnerable to sexual predators.

25

37.     Defendants' conduct and ongoing failures to monitor and provide sufficient custodial care, as alleged herein, resulted in Alyssa being the victim of multiple sexual advances and assaults, including rape, at defendants' facility.

38.     These abject and ongoing failures came to light when a facility staff person called Alyssa's responsible party, her father Jeff Doe, on or about November 4, 2021 and stated that Alyssa had been raped at the facility and was pregnant.  Alyssa's chart at the facility shows a report that Alyssa had been sexually assaulted by member of defendants' staff.  Alyssa's chart shows that on November 4, 2021 a "Police officer came and interviewed resident. Per officer, resident did not give consent for any sexual activity." Alyssa's chart at the facility further shows that the police officer "said that resident stated she did not give consent, it happened 20 times."

39.     Based on information and belief, the person who raped and impregnated Alyssa was an employee of the facility at the time of the rape, and the rape occurred in the course of his duties as an employee of defendants.  As of the date of the filing of this complaint, defendants have refused to share any information about the identity of the perpetrator. Based on information and belief, defendants were aware and had sufficient prior information to know the employee was unfit and posed a danger to Pine Ridge's vulnerable residents, including Alyssa.  Based on information and belief, defendants ratified the employee's conduct by failing to promptly and properly investigate when information was known and available that he posed a risk to the residents, and by failing to take prompt remedial action, including discipline and termination, after learning of his improper

conduct. Defendants are vicariously liability for this employee's tortious conduct under the rule of respondeat superior.

40.    As a consequence of defendants and their agents and employees' conduct and reckless neglect, Alyssa has suffered injuries in the nature of sexual assault, sexual battery, rape, harassment and an unwanted pregnancy that resulted in a birth on December 19, 2021.

41.    Amazingly, despite Alyssa being pregnant for many months prior the facility calling her father on November 4, 2021, the facility neglected her during that entire time by failing to provide or obtain needed prenatal care and monitoring. Defendants nurses were charged with 24/7 care of Alyssa and were required to monitor her ongoing health needs at all times. It is unfathomable that a pregnancy could be missed by trained health care providers for so many months, and yet Alyssa's chart at the facility contains no information about the pregnancy or prenatal care prior to November 4, 2021. Based on information and belief, including information of a pattern by defendants to cover-up incidents of sexual assaults at their facilities, plaintiffs allege that defendants and their agents were aware and should have known that Alyssa had been sexually assaulted well before November 4, 2021, and yet decided to ignore and withhold that information from Alyssa's family, the authorities and others. To the extent defendants and their agents did not know of Alyssa's sexual assault and pregnancy prior to November 4, 2021, such ignorance was the result of the overall failures of care at Pine Ridge, including chronic understaffing and failures to screen and supervise staff and residents, that were ongoing at Pine Ridge for several years prior to November 2021.

42.     The failures by defendants to provide or obtain prenatal care for Alyssa prior to November 4, 2021 caused Alyssa to needlessly suffer pain and discomfort from the unwanted pregnancy. Needed medications, assessments and treatments were not provided for a prolonged period resulting in, among other things, increased/unnecessary pain, discomfort and complications from the pregnancy. Potential options for the pregnancy and pregnancy care were also limited with the passage of time during which no prenatal care was provided. Alyssa's nutritional intake and status was also compromised during this time, among many other consequences from defendants' failure to provide or obtain prenatal care for her.

43.     Moreover, during the many months that Alyssa was pregnant prior to November 4, 2021, defendants continued to administer medications and treatments to Alyssa known to be unsafe and/or contraindicated during pregnancy, and which put her and the unborn child at serious risk and caused Alyssa to suffer. As just one example, during that entire time of Alyssa's pregnancy prior to November 4, 2021, defendants and their staff continued to administer Valproic Acid to Alyssa three times a day, which had been prescribed for her Schizophrenia. Valproic Acid has long been known to be dangerous during pregnancy[2] and absolutely should not been given to Alyssa when pregnant.

44.     Defendants also failed to provide or obtain needed care, including prenatal care and monitoring, for Alyssa after her pregnancy was communicated to her family on November 4, 2021 and before she was discharged to the acute hospital on November 19,

---

[2] *See, e.g.* https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-children-born-mothers-who-took-valproate-products-while-pregnant-may (last accessed 6/16/22).

1    2021. As a result, on November 19, 2021, Alyssa was taken by ambulance from Pine Ridge

2    to the acute hospital for a severe change of condition. Among other things, it was

3    determined that Alyssa was severely anemic, in poor health, and needed a blood transfusion.

4    Even though staff knew Alyssa was pregnant, and even though they were aware even before

5    the pregnancy that she required staff supervision for eating and drinking due to her

6    cognitive impairments, the facility did not provide or ensure that Alyssa received the

7    amount of food, nutrition and fluids required for both for her own health and safety as well

8    as for the unborn baby. Facility staff were also not informed of Alyssa's nutritional and

9    fluid needs during this time. As one example of the resulting failure, documentation in her

10   chart at the facility shows that Alyssa required 2,394 ml of fluids each day and yet her

11   documented daily intake from November 9 to 18, 2021, was never more than 800 mls and

12

13   on one day was only 240 mls. During this time Alyssa also had not been eating the types of

14   amount of food needed for her and the baby's health. This neglect after November 4, 2021

15   caused Alyssa to needlessly suffer and complications to the pregnancy.

16

17                              **COUNT ONE**
                        **[Dependent Adult Neglect**
18              **Plaintiff Alyssa Doe vs. Defendants]**

19        45.     Plaintiffs hereby incorporate the allegations asserted in paragraphs 1 through

20   44 above as though fully set forth at length below.

21        46.     Defendants had care or custody over Alyssa from June 10, 2016 to

22
     November 19, 2021. Based upon her mental and physical impairments, and her status as a
23
     resident of a 24-hour skilled nursing facility, at all times Alyssa was "dependent adult"
24
25   within the class of persons protected by Welfare and Institutions Code section 15600, *et seq.*

47.     Defendants neglected Alyssa within the meaning of Welfare and Institutions Code section 15610.57 in numerous respects. First, defendants neglected Alyssa by failing to take the custodial care measures necessary to protect her from improper sexual attention, advances, touching and rape at the facility, including by other residents and male staff members. Defendants failed to create and follow proper and necessary care plans to prevent Alyssa from being exposed to improper sexual conduct, and to address her vulnerability to predators and undue influence by male residents and staff. Defendants failed to perform necessary assessments and interventions needed to ensure that Alyssa, a person in their custodial care, would not be sexually abused. Defendants regularly and recklessly left Alyssa alone with male residents and staff who they knew and should have known posed a serious risk to Alyssa's safety and wellbeing. Defendants also failed to screen male staff members and residents who posed safety risks to Alyssa and other similarly vulnerable residents. Defendants also had a long pattern of failing to properly train staff regarding sexual abuse in the health care setting, failing to create, implement and follow necessary policies and procedures to prevent such abuse, failing to properly investigate and respond to incidents and complaints of such abuse, and allowing a culture where such abuse was tolerated and/or ignored. As a result of defendants' conduct, Alyssa was the direct victim of sexual abuse, assault and rape as alleged herein.

48.     Second, defendants neglected Alyssa by failing to provide or obtain necessary prenatal care for Alyssa prior to November 4, 2021 when defendants' staff informed Alyssa's father she was pregnant. This care, as alleged above, was vitally necessary for Alyssa's health and wellbeing as a pregnant woman, and yet it was entirely withheld literally

1  for months.  Defendants and their staff either chose to conceal the pregnancy out of fear of

2  recrimination, or their pattern of neglect of Alyssa over a prolonged period of time resulted

3  in their not knowing a patient under their custodial care was pregnant.  Alyssa had obvious

4  signs of pregnancy that any competent health care provider would recognize, including but

5  not limited to her menstrual cycle stopping for months and other symptoms, and yet no

6

7  prenatal care, assessments or monitoring were provided.  Defendants also administered

8  medications and treatments that were improper and contraindicated for a pregnant person.

9  As a result of defendants' widespread failures, as alleged more specially in the factual

10  background above, Alyssa suffered increased/unnecessary pain, discomfort and

11  complications from the pregnancy.

12
        49.      Third, defendants neglected Alyssa by entirely ignoring their obligations
13
   provide or obtain needed care, including prenatal care and monitoring, for Alyssa after her
14
15  pregnancy was communicated to her family on November 4, 2021 and before she was sent

16  to the acute hospital by ambulance on November 19, 2019.  Defendants' nurses had 24-

17  hour custodial responsibility for Alyssa and as part of that responsibility they had a duty to

18  monitor and observe Alyssa around-the-clock on a daily shift-by-shift basis, and specifically

19  to make sure she was received sufficient nutrition and hydration as a pregnant person.

20
   Defendants knew that Alyssa required careful monitoring and that she required regular and
21
22  consistent checking for proper nutrition and hydration, among other things, but they failed

23  to do these things.  As a result, as alleged more specifically in the factual background above,

24  Alyssa suffered further increased/unnecessary pain, discomfort and complications from the

25  pregnancy.

50.     Fourth, defendants neglected and abused Alyssa by failing to ensure that she was free from unnecessary pain and by failing to ensure that she was being maintained at her highest practicable level of physical, emotional and psychosocial functioning. Specifically, during her time at Pine Ridge, Alyssa suffered unnecessary pain relating to sexual abuse and assaults and not being properly cared for after she was impregnated. Clearly, Alyssa was also not maintained at her highest practicable level of functioning.  All of this was unnecessary and only occurred because of the abject failure by defendants to perform basic interventions, assessments and monitoring, and to provide appropriate custodial.

51.     The conduct of the defendants, and each of them, as detailed above resulted in enormous physical harm to Alyssa.  In addition to the physical harm caused by the defendants' neglect of Alyssa, the defendants' conduct caused Alyssa to suffer substantial mental pain and suffering.

Wherefore, plaintiffs are entitled to recover for all pain and suffering that Alyssa experienced as a result of defendants' dependent abuse and neglect, as all other damages prayed for as set forth below.

**COUNT TWO**
**[Dependent Adult Neglect (Enhanced Remedies Sought)**
**Plaintiff Alyssa Doe vs. Defendants]**

52.     Plaintiffs hereby incorporate the allegations asserted in paragraphs 1 through 51 above as though fully set forth at length below.

53.     The defendants' neglect and abuse of Alyssa outlined in paragraphs 29 through 51 above – which plaintiffs hereby incorporate by reference as if these paragraphs

were fully stated in this cause of action – was reckless, oppressive, malicious and fraudulent. Specifically, the individuals who cared for Alyssa knew that ignoring their duties to protect her from sexual abuse and assault, to provide her with necessary prenatal care, to ensure that she was free from unnecessary pain, and to ensure that she maintained her highest practicable functional status, among other things, would all cause her to suffer substantial lasting injuries.  In the face of their knowledge as to how critical each of the above patient care issues was to Alyssa's safety and health, defendants and their staff ignored these patient care issues, and each of them, by withholding the care needed and providing abysmal care that fell far below how reasonable persons in their position would have performed.  By failing to address Alyssa's patient safety and care issues, defendants knew that it was highly probable that their conduct would cause her harm and they knowingly disregarded this risk. Defendants' indifference caused Alyssa severe suffering and indignity  Defendants were aware of ample red flags and yet they chose to ignore them.  Defendants' conduct caused Alyssa to suffer sexual assault and rape.

54.     Further, defendants' neglect of Alyssa was reckless, oppressive, and malicious in that their failures were not isolated to one area of patient safety and care, but extended to numerous patient care issues, which collective failures they clearly understood would cause Alyssa either serious harm.

55.     Further, defendants' neglect of Alyssa was reckless, oppressive, and malicious because they knowingly and intentionally failed to hire, train, and supervise sufficient numbers of caregiving staff to ensure that residents at Pine Ridge, including Alyssa, were provided with the basic custodial care needed to protect them from sexual abuse and

assault, among other things.  Defendants and the care staff at Pine Ridge knew, or should

have known, that Alyssa's needs were not being met and that the failure to provide such

care created an imminent danger that she would suffer abuse, assault and other serious

and/or life-threatening harm.

56.    Defendants implemented a strategy of increasing the number of high-acuity

residents at Pine Ridge, including residents like Alyssa.  At the same time, defendants

minimized labor costs by intentionally refusing to hire sufficient numbers of care providers

to care for those residents, monitor their conditions, and provide adequate care.

Furthermore, defendants failed to employ sufficient supervisory staff to oversee and train

the care giving staff and to ensure that the care they provided met all applicable standards

of custodial care.  This was an intentional strategy undertaken by defendants to maximize

profits, even though defendants knew the care provided to residents was substandard and

put them at risk of serious harm and/or death.

57.    Defendants, and each of them, are legally responsible for the reckless neglect

Alyssa suffered because defendants' officers, directors and/or managing agents, including

the Individual Defendants, directly participated in the neglect of Alyssa.  Personnel,

including the Individual Defendants, whom the defendants vested with discretionary

decision-making authority relating to patient care and safety issues involving Alyssa were

part of the team that ignored their obligations and failed to protect her and similar

vulnerable residents from sexual abuse and assault.  This was a pattern that occurred over a

period of years.  These individuals also failed to appropriately assess and intervene to ensure

Alyssa was properly cared after she became pregnant, and failed to timely assess and

monitor Alyssa's condition to identify that her custodial needs were not being met and that these such failure would cause her to suffer substantial lasting injuries.  Such individuals were officers, directors, and/or managing agents of defendants.  The direct participation of these individuals in the abysmal lack of care provided to Alyssa subjects defendants, and each of them, to liability under the Elder Abuse and Dependent Adult Civil Protection Act.

58.    Defendants' officers, directors and/or managing agents, including the Individual Defendants, knew that there were insufficient numbers of trained and supervised direct caregiving staff to provide basic care to prevent neglect and abuse.  They knew Pine Ridge had so few staff that the staff could not possibly protect their patients from potential sexual abuse and assault, or attend to their basic custodial needs, among other things.  They knew that Pine Ridge had received resident and family complaints of poor care and regulatory deficiency notices for neglect and/or substandard patient care caused by poorly trained staff and/or inadequate staffing.  They were aware of this from internal reports yet did not increase staffing or take corrective action.  Despite this knowledge, defendants failed to take any steps to prevent resident neglect and abuse, failed to hire additional staff, failed to employ supervisory staff to ensure that care was delivered appropriately, and continued to admit new residents to maximize profits, knowing Pine Ridge did not have sufficient staff to care for them.

59.    In breaching these duties to Alyssa, defendants acted with conscious disregard of the serious harm that would result from their failure to perform these duties.  Defendants were motivated by a desire to increase their profits, and thus they reduced staff,

supervision, care, and supplies to dangerously low levels, which they knew, or should have known, would lead to Alyssa's injuries.

60. Further, defendants are legally responsible for the egregious neglect Alyssa suffered, because defendants' officers, directors and/or managing agents, including the Individual Defendants, directly approved of the reckless neglect at issue by specifically not taking any adverse employment action against any individual in any way relating to the abuse of Alyssa and the failures in her care, by not terminating any individual as a result of the care that Alyssa received, and by not disciplining any individual as a result of the care that Alyssa received at Pine Ridge.

61. Moreover, defendants, including the Individual Defendants, are legally responsible for the egregious neglect and abuse Alyssa suffered because from at least 2017 to 2021 they fostered and permitted a corporate-wide culture of allowing and/or ignoring sexual abuse and assault of residents in Mariner facilities, including Pine Ridge. These defendants have long been aware of systemic failures in how Mariner prevents, investigates and responds to incidents of sexual abuse and assault in its facilities, and yet they took no corrective action whatsoever. In a lawsuit filed by the State of California on April 21, 2021, where the Mariner entity defendants in this case and Pine Ridge were also defendants, the Attorney General of California asserted regarding all of Mariner's facilities that "defendants neglected their residents by failing to protect them from violence and sexual predation by other residents," "Residents with predatory histories and violent pasts were brought into the facilities," and that "despite the high number of sexual assaults none were reported, as

legally required."[3] Despite being on notice of these claims of systemic failures when the

lawsuit was filed, and previously for years, defendants took no corrective action.

62.     Even with respect to Pine Ridge specifically, in 2019 the California

Department of Public Health (DPH) conducted and investigation and then cited Pine Ridge

for systemic failures that led to horrific sexual abuse of at least one resident and allegations

of unwanted sexual contacts by no less than 6 Pine Ridge residents. This resulted in a Class

A Citation and a $20,000 fine. Defendants, including the Individual Defendants, were

directly responsible for failing to remedy these rampant failures at Pine Ridge that then later

resulted in the sexual abuse and rape of Alyssa.

63.     Instead of taking appropriate corrective action at Pine Ridge and the other

Mariner facilities to prevent sexual abuse of residents, defendants have resorted to a pattern

and practice of attempting to cover-up and conceal incidents of sexual abuse assault in their

facilities. Such conduct includes, but is not limited to, transferring a resident known to have

committed multiple sexual assaults at one Mariner facility to another Mariner facility

without taking appropriate preventative action and without fully informing the new facility

of the problem.

64.     The Mariner Corporate Defendants, and each of them, are legally responsible

for the widespread neglect Alyssa suffered for the reasons identified above and for

numerous independent additional reasons. Specifically, the Mariner Corporate Defendants

engaged in a significant pattern of violating applicable federal and state staffing regulations

---

[3] *See People of the State of California v. Mariner Health Care, Inc., et al.* Alameda County Superior Court Case No.
RG21096881 (Complaint Filed 4/8/21)

and laws governing skilled nursing facilities, including but not limited to 42 CFR section 483.30, California Health and Safety Code section 1599.1, 22 CCR section 72329.1 and 22 CCR section 51215.5. The Mariner Corporate Defendants and their managing agents were aware of these and other applicable federal and state staffing laws and regulations governing Pine Ridge and yet they had a significant pattern of knowingly violating them before, during, and after Alyssa's residency.

65.     In choosing to maximize profits at the expense of patient care, the Mariner Corporate Defendants knew that their plan posed a substantial and imminent danger to the health, safety and well-being of the patients they provided services to. Indeed, the Mariner Corporate Defendants and their officers, directors, and managing agents had specifically been put on notice of the egregious failures of their personnel to provide adequate patient care by, among other things, the numerous deficiencies and citations imposed by the California Department of Public Health, the public entity statutorily entrusted with providing regulatory oversight of these facilities. Further, Mariner facilities have been subjected to numerous civil lawsuits for which they have been forced to pay millions of dollars in settlements relating specifically to the abysmal patient care provided by these Mariner facilities. Despite being placed on specific notice of the repeated and significant shortcomings of patient care at Pine Ridge, the Mariner Corporate Defendants have continued to operate Pine Ridge without making the necessary changes to address identified shortcomings in patient care.

66.     In addition, even though they knew Pine Ridge did not have sufficient staff to care for its residents, the Mariner Corporate Defendants kept admitting new residents,

and kept admitting patients with high acuity levels (*i.e.*, patients with greater care needs who require more nursing staff time per shift per day), without increasing staffing, and hid the problems from prospective families and governmental agencies, including by intentionally and systematically inflating the claimed amount of nursing care staff provided to patients as reported to state and federal agencies.  This is part of a larger scheme by the Mariner Corporate Defendants to "game" the 5 Star rating system with false representations and manipulations of the different components that comprise the 5 Star rating of their facilities, including with respect to (1) reported staffing, (2) reported MDS quality indicators, and (3) results of the annual surveys by the California Department of Public Health.  Families and patients rely upon CMS's 5 Star Rating as a major factor in deciding where to go.

67.     The conduct of defendants, and each of them, as detailed above resulted in enormous physical and mental harm to Alyssa.  In addition to the physical harm caused by defendants' flagrant disregard for Alyssa's safety and well-being, the defendants' conduct caused Alyssa to suffer horrific mental pain and suffering.

68.     Under Welfare and Institutions Code sections 15657(a) and (b), defendants are liable to plaintiffs for damages for Alyssa's pain and suffering, injuries, medical expenses, and attorneys' fees and costs.

69.     Defendants' violations of the various provisions of the Elder Abuse Act, which provisions embody a substantial public interest to protect the health and welfare of elderly and dependent persons, was despicable and in conscious disregard of Alyssa's rights, health, and welfare.

70.     As is discussed more fully above, defendants acted with fraud, malice, oppression, and recklessness in doing so, thereby entitling plaintiffs to punitive damages in connection with defendants' conduct.

Wherefore, plaintiffs pray for damages as set forth below.

## COUNT THREE
### [Negligence (Custodial)
### Plaintiff Alyssa Doe vs. Defendants]

71.     Plaintiffs hereby incorporate the allegations asserted in paragraphs 1 through 70 above as though set forth fully below.

72.     From June 10, 2016, to November 19, 2021, plaintiff Alyssa was admitted to Pine Ridge, which was controlled and operated by defendants, and each of them.  The defendants owed Alyssa a duty to act reasonably in caring for her custodial needs, including, among other things, ensuring that her basic custodial needs were met and to protect her from sexual abuse and assaults.

73.     The defendants failed to meet these duties of care identified above as to Alyssa.

74.     As a proximate result of defendants' failure to meet their duties of care as to Alyssa, Alyssa suffered enormous physical harm, mental harm, and pain and suffering.

Wherefore, plaintiffs are entitled to recover for harm, pain and suffering that Alyssa experienced as a result of defendants' breaches of their duties to Alyssa as well as all other damages prayed for as set forth below.

## COUNT FOUR
### [Violation of Patients' Bill Of Rights
### Plaintiff Alyssa Doe vs. Defendants]

75.     Plaintiffs hereby incorporates the allegations asserted in paragraphs 1 through 74 above as though set forth fully below.

76.     Alyssa was a resident at Pine Ridge, a skilled nursing facility as defined in subdivision (c) of Health and Safety Code Section 1250, in 2020 and 2021.

77.     As a resident at a skilled nursing facility, Alyssa had certain patient rights as enumerated in various statutes and regulations under federal and state law.  In particular, and without limiting the generality of the foregoing, Alyssa had the following rights, among others:

   (a) To be free from mental and physical abuse;

   (b) To be treated with consideration, respect, and full recognition of dignity and individuality, including privacy in treatment and in care of personal needs;

   (c) To have the facility employ an adequate number of qualified personnel to carry out all functions of the facility;

   (d) To be provided the appropriate care necessary to ensure good personal hygiene;

   (e) To have a system to call nurses that is maintained in good operating order; and

   (f) To have her physician notified promptly of all changes in condition.

78.     As set forth above, defendants violated Alyssa's legal rights as a resident by, among other things, causing her to be sexually abused and assaulted, and ignoring their obligations to protect her from sexual abuse, to provide the basic custodial care she

1    required, to ensure that she was free from unnecessary pain, and to ensure that she

2    maintained her highest practicable functional status.

3        79.    As a result of defendants' violations of her patient rights, Alyssa suffered

4    avoidable injuries and endured great pain.  Pursuant to Health and Safety Code Section

5    1430(b), Pine Ridge is civilly liable to Alyssa for each and every violation of her patient's

6

7    rights.

8        Wherefore, plaintiffs are entitled to recover civil fines for each and every violation of

9    Alyssa's patient's rights, attorneys' fees arising from the prosecution of this action,

10   injunctive relief as described in Attachment A below, and all other damages prayed for as

11   set forth below.

12

                              **COUNT SIX**
13                  **[Negligent Infliction Of Emotional Distress**
                    **Plaintiff Jeff Doe vs. Defendants]**
14

15       80.    Plaintiffs hereby incorporate the allegations asserted in paragraphs 1 through

16   79 above as though set forth fully below.

17       81.    Plaintiff Jeff Doe is the father of Alyssa and he is extremely close to his

18   daughter.  Despite living 300 miles away, Jeff visited Alyssa as often as he could at Pine

19   Ridge in person, and regularly by phone.

20       82.    After being informed by defendants' staff on November 4, 2021 that his

21

22   daughter had been raped and was pregnant, Jeff became aware of defendants' utter failure

23   to attend to her needs a pregnant person.

24       83.    On multiple occasions, Jeff directly witnessed and learned of the

25   maltreatment and neglect of Alyssa, including but not limited to, the defendants' utter

1  failure to provide prenatal and custodial care she needed as a pregnant person.  During this

2  time, he witnessed Alyssa's worsening condition due to defendants' failures.  Through these

3  direct observations, Jeff gained enough of an understanding of the maltreatment and

4  neglect of Alyssa at the time it was occurring to have contemporary sensory awareness that

5  the defendants' conduct was in fact maltreatment and neglect and that it was causing Alyssa

6  injury.  As a result of being present and observing the consequences of the defendants' utter

7  neglect, Jeff suffered severe and substantial emotional distress, beyond that which would be

8

9  anticipated in a disinterested witness.

10         84.     The defendants' neglect and maltreatment of Alyssa directly caused the

11  emotional distress suffered by Jeff.

12         Wherefore, plaintiffs are entitled to recover for harm, pain and suffering that Jeff

13  suffered as well as all other damages prayed for as set forth below.

14         **WHEREFORE,** plaintiffs pray for judgment as follows:

15

16     1.     For general damages according to proof;

17     2.     For special damages according to proof;

18     3.     For attorneys' fees against the Defendants pursuant to Welfare and

19            Institutions Code section 15657(a), Health and Safety Code section 1430(b),

20            and Code of Civil Procedure section 1021.5;

21

22     4.     For statutory damages according to proof;

23     5.     For punitive damages against defendants;

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6.    For an order pursuant to Health & Safety Code §1430 enjoining Defendants from future violations of the patient rights at Defendants' facilities (identified further in Attachment A);

7.    For disgorgement of benefits and return of profits; and

8.    For costs of suit against the Defendants, and for such other and further relief as the Court deems just and proper.

Dated: June 16, 2022                                        *Dudensing Law*

Jay P. Renneisen
Attorneys for Plaintiffs

1

**ATTACHMENT A**

2
Pursuant to of Health and Safety Code Section 1250 and plaintiffs' proof that

3
defendants violated Alyssa Doe's patient rights, defendants are hereby ordered and enjoined

4
as follows:

5
      1.      Defendants shall ensure that no patient rights are violated at their facilities;

6

7
      2.      Defendants shall ensure that staff at their facilities are properly trained with

8
respect to preventing sexual abuse and assault of their patients;

9
      3.      Defendants shall ensure that staff at their facilities are properly trained with

10
respect to how to respond to, investigate, and report allegations of sexual abuse and assault

11
of their patients;

12
      4.      Defendants shall ensure that all of their patients are maintained at their

13
highest practicable level of functionality;

14

15
      5.      Defendants shall ensure that their patients are free from unnecessary pain;

16
and

17
      6.      Defendants shall ensure that their facilities are adequately staffed, both

18
quantitatively and qualitatively, to meet the needs of their patients.

19

20

21

22

23

24

25